# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MICHAEL NADEAU
140 Deer Run
Colchester, CT 06415
WAYNE GAGNE
49 Tenby Drive
Nashua, NH 03062
PATRICK FARRELL
20323 Pinecreek Ridge Lane
Klein, TX 77397
and all other similarly
situated,

     Plaintiffs,

vs.                                                                      Case No.:

DANAHER CORPORATION
2200 Pennsylvania Avenue NW Suite 800W
Washington, D.C. 20037
PALL CORPORATION,
25 Harbor Park Drive
Port Washington, NY 11050
BECKMAN COULTER, INC.
5350 Lakeview Parkway Drive South
Indianapolis, IN 46268
GLOBAL LIFE SCIENCES
SOLUTIONS USA LLC d/b/a CYTIVA
100 Results Way
Marlborough, MA 01752
AB SCIEX LLC d/b/a SCIEX
250 Forest Street
Marlborough, MA 01752

     Defendants.

_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

     Danaher Corporation's ("Danaher") Diversity, Equity and Inclusion Policy ("DEI Policy"),

reaches far beyond ensuring an equal opportunity workplace. It establishes hiring quotas and is the

source of systemic discrimination against applicants and employees who are not members of

1

Danaher's preferred "underrepresented" groups, including Plaintiffs. Plaintiffs Michael Nadeau, Wayne Gagne, and Patrick Farrell (collectively "Named Plaintiffs"), on behalf of themselves and others similarly aggrieved, bring this action to hold Danaher (including its wholly owned subsidiaries, collectively "OpCos")[1], accountable for violating their federally protected rights, as in support thereof state:

## <u>NATURE OF THE CLAIMS</u>

1.     Named Plaintiffs, white men, allege they have been discriminated against based on race in violation of 42 U.S.C. § 1981 and sex in violation of Title VII. Named Plaintiffs further allege that Defendants' policies and practices constitute intentional disparate treatment under Title VII, and that Defendants' race-based practices also violate § 1981.

2.     Danaher is an American Fortune 200 company. It operates globally, primarily in the life sciences, diagnostics and biotechnology sectors. Danaher, a conglomerate, is comprised of more than two dozen wholly owned subsidiaries (also referred to as "OpCos"), the largest of which include Cytiva US LLC, Beckman Coulter, Inc., Cepheid, Inc., HemoCue AB, Leica Microsystems GmbH, Leica Geosystems, Inc., Devicor Medical Products, Radiometer America, Inc., Abcam Ltd., Aldevron, LLC, Genedata AG, ID Business Solutions Ltd., Integrated DNA Technologies, Inc., Molecular Devices, LLC, Phenomenex, Inc., and AB Sciex LLC. (collectively "Danaher" or "OpCos"). Collectively, Danaher and its subsidiaries employ over 25,000 employees in the United States.

3.     Danaher has contracts with the United States Federal Government under which it provides goods and services.

---

[1] Danaher refers to its wholly owned and indirectly owned subsidiaries as "OpCos." With the exception of Danaher Corporation, Defendants in this action are Danaher OpCos.

4.      Danaher implemented a DEI Policy that is discriminatory against Plaintiffs and the putative Classes. As a direct result of the DEI Policy, qualified white applicants who are not members of Defendants preferred "underrepresented" groups, including Plaintiffs, have been systematically denied interviews and selection for positions because Defendants elevated race and sex as criteria in the screening and interview-selection process. Danaher refers to non-whites as People of Color ("POC"). Danaher classifies women and non-whites as "underrepresented."

5.      Danaher has implemented functional quotas for hiring women and POC. Danaher manipulates job descriptions and creates "shortlists" of diverse candidates to ensure its internal quotas are satisfied.

6.      Danaher's DEI Policy favors women and POC in all aspects of employment while discriminating against white men. Diverse candidates receive hiring opportunities which are not available to white men. In practice, Defendants' centralized gatekeeping process restricted access to interviews for non-preferred applicants because interview slots were finite and Defendants reserved slate capacity for "underrepresented" candidates.

7.      Danaher's DEI Policy has permeated all aspects of employment at Danaher and its OpCos, and as a result, applicants for employment that are not women or POC have been subjected to unlawful discrimination.

8.      Named Plaintiffs, on behalf of the putative Classes of aggrieved applicants, bring this action to hold Danaher accountable for unlawful discrimination.

## PARTIES

9.      Plaintiff Nadeau is a white male and a citizen of the United States.

10.     Plaintiff Gagne is a white male and citizen of the United States.

11.     Plaintiff Farrell is a white male and citizen of the United States.

12.    Defendant Beckman Coulter is a Danaher OpCo and employs over 5,000 employees in the United States.

13.    Defendant Cytiva is a Danaher OpCo. Cytiva employs over 5,000 employees in the United States.

14.    Defendant Sciex is a Danaher OpCo. Sciex employs over 5,000 employees in the United States.

15.    Defendant Pall is a Danaher OpCo and employs over 5,000 employees in the United States.

16.    Danaher is the parent company to its OpCos, including Defendants Beckman Coulter, Cytiva, Sciex, and Pall.

17.    Danaher Corporation and the operating-company defendants functioned as an integrated enterprise and/or joint employers with respect to the challenged hiring and interview-selection practices. Danaher exercised centralized control over labor relations and the essential terms and conditions of the hiring process by dictating mandatory recruiting and interview-slate requirements, setting uniform policies governing candidate screening, and requiring compliance reporting across operating companies.

18.    Danaher's control was not limited to issuing generalized corporate values statements. Danaher maintained and administered centralized recruiting infrastructure and governance—including standardized hiring workflows, centralized Talent Acquisition functions, and reporting requirements—through which Danaher influenced or controlled which candidates would be advanced to interview and selection for positions at the operating companies.

19.    Danaher's control was not limited to issuing generalized corporate values statements. Danaher designed, maintained and administered performance management systems

4

across its OpCos, which aligned with Danaher's discriminatory hiring practices. Specifically, executives and managers were rated on their hiring of female and diverse candidates. In practice, executives and managers were rewarded for hiring female and diverse candidates and penalized for hiring men and non-diverse candidates.

20.    Danaher also maintained the authority and practical control to enforce compliance with its hiring and interview-slate requirements, including through escalation procedures, compliance monitoring, and performance accountability mechanisms. Through these means, Danaher exercised direct and indirect control over the challenged employment decisions sufficient to be treated as an employer under Title VII and as a contracting party or entity interfering with contractual rights under § 1981.

21.    Alternatively, because Danaher exerted significant control over the terms and conditions of its OpCos' employees, Danaher is a joint-employer of its OpCos' employees.

22.    In determining whether Danaher was an employer or joint employer under Title VII, courts in this Circuit consider the totality of the circumstances under the common-law agency "hybrid" test, with the right to control the work and the employment relationship as the most important consideration. Danaher's centralized, mandatory gatekeeping rules for recruiting, screening, and interview advancement satisfy this standard.

23.    Danaher exercised substantial control over the means and manner of the challenged DEI policy and the centralized recruiting and screening process that implemented it such that Danaher qualifies as an employer and/or joint employer for purposes of Title VII.

24.    Danaher's centralized control included, among other things:

         (a)  ownership and/or administration of the applicant tracking system used for the requisitions at issue;

(b) required standardized recruiting stages and dispositions;

(c) centralized Talent Acquisition personnel responsible for screening and slate creation;

(d) mandatory interview-slate composition rules;

(e) centralized dashboards and reporting that tracked interview slate composition and hiring outcomes by race and sex;

(f) escalation and enforcement mechanisms when a requisition's slate did not satisfy required demographic targets, including delaying, reopening, or extending requisitions until compliance was achieved;

(g) centralized guidance, training materials, and recruiter playbooks instructing personnel how to operationalize "underrepresented" slate requirements; and

(h) centralized compliance monitoring and periodic reporting to Danaher leadership regarding slate composition and hiring outcomes.

## JURISDICTION AND VENUE

25.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981.

26.    The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a) because those claims are so closely related to the federal claims in this case that they form part of the same case or controversy under Article III of the United States Constitution. Plaintiffs' federal and state law claims arise from the same facts and would ordinarily be expected to be resolved in one judicial proceeding.

27.    This Court has personal jurisdiction over Defendant because it transacts business

in, directs recruiting and hiring activities into, and caused injury within this District.

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District and because Danaher is subject to this Court's personal jurisdiction with respect to this civil action.

## ADMINISTRATIVE PREREQUISITES

29.     Plaintiff Nadeau has exhausted his administrative remedies and complied with all statutory prerequisites to his Title VII claims against Beckman Coulter, AB Sciex LLC d/b/a Sciex and Cytiva.

30.     Plaintiff Gagne has exhausted his administrative remedies and complied with all statutory prerequisites to his Title VII claims against Cytiva and Beckman Coulter.[2]

31.     Plaintiff Farrell has exhausted his administrative remedies and complies with all statutory prerequisites to his Title VII claims against Pall.

32.     Plaintiff Nadeau brings this action within 90 days of receiving his Notice of Right to Sue.

33.     Plaintiff Gagne brings this action within 90 days of receiving his Notice of Right to Sue.

34.     Plaintiff Farrell brings this action within 90 days of receiving his Notice of Right to Sue.

35.     Each Title VII plaintiff timely filed an EEOC charge alleging the discriminatory hiring practices described herein and received a Notice of Right to Sue. Each such plaintiff filed

---

[2] All Plaintiffs have charges of discrimination against Danaher Corp. which are still pending with the EEOC. Plaintiffs have requested right to sue letters from the EEOC, and intend to amend the complaint as the EEOC issues notices of right to sue. Plaintiffs do not allege they have exhausted administrative remedies with respect to any claims against Danaher Corp.

this action within ninety (90) days of receipt of that Notice. The discriminatory practices challenged in this Complaint were within the scope of the EEOC investigation that could reasonably be expected to grow out of the charges.

36.    To the extent Defendants contend that any related entity was not explicitly named in a charge, Plaintiffs allege that the entities functioned as an integrated enterprise and/or joint employers with shared control over the challenged hiring practices, and that the EEOC charge allegations put Defendants on notice of the centralized, companywide nature of the discriminatory screening and slate-composition requirements

37.    All other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

### *Danaher's DEI Policy*

38.    For all times relevant to Plaintiffs' allegations, Danaher has maintained a DEI policy. The DEI Policy applies to all aspects of employment throughout the Danaher system[3]:

> This Diversity, Equity and Inclusion Policy (the "Policy") sets out the principles upon which Danaher's D+I program is based and the requirements applicable to our employees (whom we refer to as "associates") and businesses. This policy applies to (among other topics) our practices and policies on talent acquisition and selection; compensation and benefits; development and training, career growth, associate engagement and inclusion; and transitions. In this Policy, we refer to Danaher and its directly and indirectly controlled subsidiaries worldwide as "Danaher".

39.    Defendants implemented and enforced a centralized, companywide hiring and interview-screening process that operated as a mandatory gatekeeping step for positions across Danaher operating companies. Under this process, candidates were first screened by centralized Talent Acquisition personnel using a common applicant-tracking system and standardized screening stages before any hiring manager interview could occur.

---

[3] Consistent with Danaher's DEI Policy, Danaher and its "directly and indirectly controlled" subsidiaries are referred to collectively as "Danaher" unless otherwise specified.

40.     Since at least 2021, Danaher imposed DEI requirements upon its subsidiaries through its DE&I Policy Deployment Initiative. *Danaher Corp. Dec. 31, 2023, Form 10-K. p. 9.*

**Application, Governance and Communication**

    a.     <u>Application</u>.  This Policy applies to Danaher Corporation and all of its directly and indirectly controlled subsidiaries worldwide, and each of their respective associates.
    b.     <u>Governance</u>.  This Policy (including each individual section thereof) has been approved by Danaher Corporation's President and Chief Executive Officer and Senior Vice President-Human Resources.
    c.     <u>Communication</u>.  Danaher commits to communicating this Policy to its associates and external stakeholder through Danaher's intranet, external website, annual Sustainability Report and other channels.  We also commit to reporting on Danaher's progress and impact with respect to the elements reflected in this Policy in our annual Sustainability Reports.

*Policy revised June 10, 2022*

41.     The DEI Policy establishes a standardized approach for evaluating potential hires, with decisions dictated by numeric racial and gender-based quotas. In practice, Defendants operationalized these quotas through mandatory demographic interview-slate composition rules and centralized gatekeeping constraints on who could be advanced to interviews.

42.     As further described herein, in reality, the DEI Policy was a quota system that discriminated against white men on the basis of their race and sex/gender. These practices were implemented through centralized screening and slate controls, not merely aspirational statements.

43.     The DEI Policy classifies people who are not white as "People of Color ('POC'). Women and POC, in combination, are considered "under-represented."[4]

44.     The DEI Policy provides for preferential consideration for women and POC, which as will be further explained below, caused Plaintiffs to not be hired and/or interviewed for positions they were qualified for and POC and/or women were hired instead of Plaintiffs.

---

[4] Danaher's definition of "POC" and "underrepresented," and which groups of people are covered in which instances, is presently unknown. Regardless, white men (and perhaps other races) are not covered and are therefore subjected to unlawful discrimination.

45.    There is nothing unlawful about striving to ensure an organization offers equal employment opportunities to everyone. There are several federal, state and local laws intended to prevent workplace discrimination and hold employers accountable for discrimination based upon protected characteristics such as race and sex. In fact, in March 2025, the EEOC issued a policy statement on DEI, echoing equal application of Title VII to everyone:

> Diversity, Equity and Inclusion (DEI) is a broad term that is not defined in Title VII of the Civil Rights Act of 1964 (Title VII). Title VII prohibits employment discrimination based on protected characteristics such as race and sex. Under Title VII, DEI initiatives, policies, programs, or practices may be unlawful if they involve an employer or other covered entity taking an employment action motivated—in whole or in part—by an employee's or applicant's race, sex, or another protected characteristic.

46.    Danaher's DEI-driven policies and practices far exceeded the bounds of the EEOC's guidance, requiring race and gender must be considered when evaluating applicants at Danaher and its OpCos. The DEI Policy is discriminatory, and the source of unlawful and discriminatory employment practices.

47.    For example, Danaher's DEI Policy **required that 50% of candidates** interviewed for open positions be from "underrepresented" populations.



**Targeting Diversity of Slates and Hires**

Implementing diverse slates at Danaher and across OpCos is a strategy with the goal to have 50% underrepresented candidates interviewed.

Diverse slates show the possibility and range of qualified talent available in the market, which may include prospects, passive profiles, or active candidates. By taking these discreet and specific actions to broaden candidate pools, we help increase the diversity of candidates.

Through these intentional diversity recruitment efforts, Danaher can accelerate our talent outreach and maximize the chances of hiring the most qualified candidate of every gender, race, and ethnicity.

48.    In practice, Defendants treated the "50% underrepresented interviewed" requirement as a mandatory gatekeeping condition: candidate slates could not be released for interviews, and requisitions could be delayed or escalated, unless and until the slate satisfied the required demographic composition.

49.    Danaher's DEI Policy is anything but "discreet." By its own terms, it is "specific" and "intentional," manipulating the composition of interview slates consistent with the DEI Policy and functional hiring quotas.

50.    Women and POC have comprised less than 50% of the qualified pool for sales and management positions. By artificially populating an interview pool with under-represented candidates disproportionate to the applicant pool, Danaher discriminated against applicants who were not from an underrepresented group. White men were disproportionately not hired and excluded from the interview pool because Danaher was motivated by race and sex when selecting candidates for open positions.

51.    Danaher implemented and dictated the DEI Policy throughout the Danaher system, including its OpCos.

52.    Danaher's centralized Talent Acquisition Department ("Talent Acquisition") controlled the recruiting and hiring process for open positions and implemented Danaher's DEI Policy therein.

53.    Talent Acquisition collected applications for open positions. It screened applicants to create a slate of candidates for the hiring manager to interview. That is, it made an initial determination as to which applicants progressed to the "candidate" stage in the hiring process.

54.    Applicants that did not progress out of the candidate stage did not have an opportunity to interview with the hiring manager and were effectively "rejected" for the position.

Only candidates selected for interview remained in contention for the position.

55.    Danaher modified job descriptions and requirements to "open the aperture" to diverse applicants. Differently put, diverse applicants did not have to meet the same job requirements as applicants that were not diverse, *i.e.* white men.

56.    Danaher modified job requirements for diverse applicants to ensure Danaher satisfied its race and sex/gender driven hiring quotas.

57.    Diverse candidates that satisfied the "flexible" job requirements were placed on a shortlist to be interviewed by the hiring manager. The shortlist was an advantage specifically reserved for diverse candidates. There was no shortlist for non-diverse applicants. Put differently, there were different standards for applicants based on race and sex/gender.

58.    Only *after* Talent Acquisition performed its initial screening were interview slates presented to the hiring manager for interviews. Hiring managers were presented with a pre-selected shortlist of diverse candidates. There was no shortlist for non-diverse candidates.

59.    In practice, Defendants' centralized screening process required that interview slates (including the subset of candidates advanced to interviews) satisfy predetermined demographic targets, including targets based on race and sex. These requirements were not aspirational statements of equal opportunity; they were enforced operational constraints that controlled which candidates could advance past screening and into interview stages for posted role.

60.    As a direct result of these enforced demographic screening rules, similarly or more qualified non-diverse applicants were routinely delayed, deprioritized, or rejected at the screening stage—before any individualized assessment by a hiring manager—because advancing them would have prevented the slate from meeting Defendants required demographic

composition.

61.     Danaher required that 50% of interviewed candidates be diverse or female candidates. This far exceeded the percentage of diverse or female applicants in the initial applicant pool. As a result, Danaher discriminatorily under hired white males after implementing this systemically discriminatory DEI policy/practice.

62.     Interview slates consisted of a disproportionately high percentage of females and diverse candidates relative to the overall applicant pool.

63.     Because there were a finite number of applicants selected for interviews with the hiring manager, white men were disproportionately deprived of interview opportunities relative to their representation in the applicant pool.

64.     This process has effectively limited the hiring manager's ability to make merit-based selections, resulting in outcomes engineered to satisfy Danaher's illegal hiring quotas. This process limited merit-based selection and steered outcomes toward compliance with demographic quotas rather than job-related criteria. Even when a hiring manager later exercised discretion, Defendants' centralized gatekeeping step constrained which applicants could ever reach the manager for consideration.

65.     Danaher encouraged discriminatory hiring practices. Hires that moved Danaher closer to its functional quotas were considered wins; hiring decisions that were not aligned with Danaher's objectives were considered losses.

66.     Hiring managers faced pressure to increase minority representation to meet Danaher's diversity objectives, reinforcing the company's quota-driven approach to hiring.

67.     Danaher required its leaders to follow DEI Performance Objectives. Performance objectives were tied to Diversity & Equity priorities.

68.    Defendants tracked compliance with these demographic interview-slate requirements through centralized reporting and governance, including regular reporting on interview slate composition and hiring outcomes by race and sex and escalation when a requisition's slate did not meet the required demographic criteria. Defendants incentivized and enforced compliance through performance objectives, metrics, and managerial accountability tied to hiring decisions.

69.    Danaher tethered manager performance evaluations, career advancement opportunities and compensation to meeting DEI Policy objectives. Managers who did not meet Danaher's *de facto* quotas received lower performance evaluations, less career advancement opportunities and lower discretionary compensation.

70.    To further its unlawful and discriminatory hiring practices, compliance with Danaher's DEI objectives was a critical component of management performance evaluations. For example, the "People & Culture" category was 15-25% of a manager's overall performance review. Within "People and Culture," managers were instructed to "Strengthen DEI and female . . .from X to Y (PD Goal)," "Strengthen DEI position" and "Improvement in Regional DEI position." By tethering performance evaluations with DEI-driven policy objectives intended to increase female and POC workforce representation to meet its quotas, Danaher forced decisionmakers to consider race and sex in hiring decisions.

### The DEI Policy in Application

### Danaher's DEI Policy is a Quota System

71.    Danaher's DEI Policy is discriminatory against applicants and employees that are not diverse or underrepresented. For example, Danaher's 2024 Sustainability Report proclaimed

success because over two-thirds (68%) of its new hires in the United States in 2023 were women and/or POC, and POC represented 42% of its workforce:

- 63,000 associates in more than 50 countries
- Invested nearly $12 million in our communities in 2023, focused on Building a Diverse, STEM-ready Workforce, Advancing Healthcare Innovation and Protecting the Environment
- Adopted a Diversity, Equity and Inclusion Policy
- 40% of 2023 global new hires were women, and at the end of 2023 women represented 40% of our global workforce
- 68% of 2023 U.S. new hires were women and/or People of Color (POC), and at the end of 2023 POCs represented 42% of our U.S. workforce
- Maintained total direct compensation pay equity for women globally and for racial and ethnic minorities in the U.S.

- Women represent 40% of global workforce by 2025
- POC represent 38% of U.S. workforce by 2025
- 100% total direct compensation pay equity annually



72.     Put another way, Danaher celebrated success because less than 1/3 of people it hired in the United States in 2023 were white men.

73.     Women and POC employees received preferential hiring treatment because of their gender and race. White men made up far more than 1/3 of the qualified applicant pool but were less than 1/3 of Danaher's hires.

74.     Danaher discriminated against white men, who were disproportionately rejected for employment because Danaher unlawfully considered sex/gender and race in hiring decisions.

75.     Defendants' recruiters and Talent Acquisition personnel had access, within the applicant-tracking system and related recruiting tools, to information reflecting or permitting inference of applicants' race and sex, including applicants' voluntary EEO self-identification data and/or recruiter-visible demographic indicators used for compliance reporting and interview-slate composition.

76.     In addition, Defendants' centralized screening process was designed specifically to monitor and control candidate slates by race and sex, which necessarily required that Defendants identify candidates' demographic status at or before the interview-selection stage. Defendants

therefore acted with knowledge of Plaintiffs' protected characteristics when Plaintiffs were screened out, denied interviews, or denied selection.

77.    Defendants conducted "slate compliance" checks using recruiter dashboards or reporting tools that reflected candidates' demographic status, and Defendants' centralized Talent Acquisition personnel used those tools to determine which applicants could advance to interview stages consistent with the "underrepresented" slate requirement.

78.    Plaintiffs are informed and believe, and allege based on recruiter communications, internal hiring practices, and the stated DEI requirements quoted herein, that Defendants' decision to advance or reject candidates at the screening stage was influenced by candidates' race and sex to satisfy the mandated slate composition requirements.

79.    Plaintiffs do not rely solely on the conclusory assertion that every selectee was "less qualified." Instead, Plaintiffs allege that Defendants' screening process excluded Plaintiffs at an early stage despite Plaintiffs meeting posted qualifications and despite Defendants continuing the selection process, supporting the inference that protected traits influenced which candidates were advanced to interview and selection.

80.    When a qualified applicant is denied the opportunity to interview for a position because of their race or sex, it is an adverse employment action, regardless of whether they would have ultimately been selected for the position. Without the opportunity to interview, the excluded applicant has no chance of getting the job. Similarly, they are deprived of the networking opportunity and experience of interviewing for more advanced or different positions.

### Plaintiff Nadeau

81.    Plaintiff Nadeau is a white man. Plaintiff Nadeau was subjected to unlawful discrimination based upon his race and sex.

16

82.    Plaintiff Nadeau has over 30 years of experience in the relevant fields and has performed at a level commensurate with senior leadership roles.

83.    Plaintiff Nadeau applied for multiple positions, including Vice President, Global Service, for which he was qualified at Danaher, Cytiva, Sciex and Beckman Coulter.

84.    Plaintiff Nadeau met all of the requirements of the posted positions at Danaher, Cytiva, Sciex and Beckman Coulter.

85.    Despite meeting the requirements, Plaintiff Nadeau was denied the opportunity to interview and was not hired for every position for which he applied.

86.    Based on requisition status (including "offer closed," "filled," and/or similar disposition codes) and the continued progression of other candidates, Plaintiff Nadeau was screened out at Defendants' centralized gatekeeping step and denied the opportunity to interview. Plaintiff Nadeau applied to posted roles, met the stated minimum qualifications, and was rejected at the centralized screening stage before any interview with the hiring manager.

87.    Defendants advanced other candidates to interviews and filled the positions for which Plaintiff Nadeau applied after screening Plaintiff Nadeau out

88.    Plaintiff Nadeau alleges that his screening-out occurred under circumstances supporting an inference of discrimination, including Defendants' mandatory "underrepresented" slate requirements, the finite number of interview slots available for a given requisition, and the effect of centralized screening decisions that limited who could reach the hiring manager stage.

89.    Defendants' centralized gatekeeping and screening process operated to exclude Plaintiff Nadeau from interview consideration because he is a white man and therefore not considered "underrepresented" under Danaher's DEI Policy and related hiring and advancement framework.

90. Plaintiff Nadeau suffered adverse employment actions because he was denied the opportunity to interview for positions because of his race and sex. That is, Danaher factored race and sex into its hiring decision-making.

*Plaintiff Gagne*

91. Plaintiff Gagne is a white man. Plaintiff Gagne was subjected to unlawful discrimination based upon his race and sex.

92. Plaintiff Gagne applied for multiple positions for which he was qualified at Danaher, Cytiva and Beckman Coulter.

93. Plaintiff Gagne met all of the requirements of the posted positions for which he applied including education and experience requirements, and his application materials reflected his qualifications for the roles sought at Danaher, Cytiva and Beckman Coulter. Plaintiff Gagne's background included more than fifteen (15) years of experience in the relevant fields, and he met the stated minimum qualifications for the roles to which he applied.

94. Despite having over 15 years of experience in the specific field, Plaintiff Gagne was denied the positions.   Plaintiff Gagne was denied interviews for certain positions and denied selection for others pursuant to the same centralized slate constraints described herein. Plaintiff Gagne applied to posted roles, met the stated minimum qualifications, and was denied interview and/or selection while Defendants continued the hiring process.

95. Based on requisition status (including "offer closed," "filled," and/or similar disposition codes), and the continued progression of other candidates, Plaintiff Gagne alleges he was denied interview and/or selection despite meeting posted minimum qualifications.

96. Defendants advanced other candidates to interviews and filled at least some of the roles for which Plaintiff Gagne applied after screening him out and/or denying him selection,

through a process constrained by demographic slate requirements. Those demographic requirements operated as mandatory conditions for moving a requisition forward, such that otherwise qualified non-"underrepresented" applicants could be excluded from interview consideration to preserve or achieve the required slate composition.

97.    Discovery will prove that Plaintiff Gagne was denied positions because he is a white man, and therefore not considered underrepresented pursuant to Danaher's DEI Policy.

98.    Plaintiff Gagne suffered adverse employment actions because he was denied the positions because of his race and sex. That is, Danaher factored race and sex into its hiring decision-making.

### *Plaintiff Farrell*

99.    Plaintiff Farrell is a white man. Plaintiff Farrell was subjected to unlawful discrimination based upon his race and sex.

100.    Plaintiff Farrell applied for positions, including Field Sales Specialist, for which he was qualified at Danaher, and Pall.

101.    Plaintiff Farrell met all of the posted requirements for the positions for which he applied at Danaher and Pall. Plaintiff Farrell's application materials demonstrated that he satisfied the stated minimum qualifications for the roles to which he applied.

102.    Despite meeting the position requirements, Plaintiff Farrell was denied the opportunity to interview and was not hired for every position for which he applied.

103.    Based on requisition status (including "offer closed," "filled," and/or similar disposition codes), and the continued progression of other candidates, Plaintiff Farrell alleges he was screened out at Defendants' centralized gatekeeping step and denied interview. Plaintiff

Farrell applied to posted roles, met the stated minimum qualifications, and was rejected at the centralized screening stage before any interview with the hiring manager.

104.    Defendants advanced other candidates to interviews and filled at least some of the roles for which Plaintiff Farrell applied after screening Plaintiff Farrell out, through a process constrained by demographic slate requirements.

105.    Discovery will prove that Plaintiff Farrell was denied positions because he is a white man, and therefore not considered underrepresented pursuant to Danaher's DEI Policy.

106.    Plaintiff Farrell suffered adverse employment actions because he was denied the positions because of his race and sex. That is, Danaher factored race and sex into its hiring decision-making.

## RULE 23 CLASS ACTION ALLEGATIONS

107.    Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (c)(4) seeking liability phase injunctive and declaratory relief.

108.    Plaintiffs bring this action pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure (FRCP).

109.    Named Plaintiffs bring this Class Action pursuant to Federal Rule of Civil Procedure 23 on behalf of a proposed "Title VII Class" of similarly situated persons (subject to revision as may be necessary), defined as follows:

> **All white men, who during the applicable statute of limitations 1) were not employed by Danaher or an OpCo, 2) applied for a posted position at Danaher or an OpCo using Danaher's applicant tracking system, 3) whose applications were screened by Danaher, 4) who met the minimum requirements as recorded in Danaher's records, 5) were not interviewed or hired.**

110.    Named Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on behalf of a proposed "42 U.S.C. 1981 Class" of similarly situated persons (subject to revision as may be necessary), defined as follows:

> **All applicants who Danaher did not define as a "person of color," who during the applicable statute of limitations 1) were not employed by Danaher or an Opco, 2) applied for a posted position at Danaher or an OpCo using Danaher's applicant tracking system, 3) whose applications were screened by Danaher, 4) who met the minimum requirements as recorded in Danaher's records, 5) were not interviewed or hired.**

111.    Plaintiff Nadeau brings a subclass pursuant to Federal Rule of Civil Procedure 23 under the Massachusetts Fair Employment Practices Act ("MFEPA") on behalf of a proposed "MFEPA Sciex Class" of similarly situated persons (subject to revision as may be necessary), defined as follows:

> **All white men who, during the applicable statute of limitations 1) were not employed by Danaher or an Opco, 2) applied for a posted position at Sciex using Danaher's applicant tracking system, 3) whose applications were screened by Danaher, 4) who met the minimum requirements as recorded in Danaher's records, 5)  were not interviewed or hired.**

112.    Plaintiff Nadeau brings a subclass pursuant to Federal Rule of Civil Procedure 23 under the Massachusetts Fair Employment Practices Act ("MFEPA")  on behalf of a proposed "MFEPA Cytiva Class" of similarly situated persons (subject to revision as may be necessary), defined as follows:

> **All white men who, during the applicable statute of limitations 1) were not employed by Danaher or an Opco, 2) applied for a posted position at Cytiva using Danaher's applicant tracking system, 3) whose applications were screened by Danaher, 4) who met the minimum requirements as recorded in Danaher's records, 5)  were not interviewed or hired.**

113.    Plaintiff Nadeau brings a subclass pursuant to Federal Rule of Civil Procedure 23 under the Massachusetts Fair Employment Practices Act ("MFEPA") on behalf of a proposed

"MFEPA Beckman Coulter Class" of similarly situated persons (subject to revision as may be necessary), defined as follows:

> **All white men who, during the applicable statute of limitations 1) were not employed by Danaher or an Opco, 2) applied for a posted position at Beckman Coulter, 3) whose application was screened by Danaher, 4) who met the minimum requirements as recorded in Danaher's records, 5) were not interviewed or hired.**

114.   Plaintiff Gagne brings a subclass pursuant to Federal Rule of Civil Procedure 23 under the New Hampshire Law Against Discrimination ("NHLAD")  on behalf of a proposed "NHLAD Cytiva Class" of similarly situated persons (subject to revision as may be necessary), defined as follows:

> **All white men who, during the applicable statute of limitations 1) were not employed by Danaher or an Opco, 2) applied for a posted position at Cytiva, 3) whose application was screened by Danaher, 4) who met the minimum requirements as recorded in Danaher's records, 5) were not interviewed or hired.**

115.   Plaintiff Gagne brings a subclass pursuant to Federal Rule of Civil Procedure 23 under the New Hampshire Law Against Discrimination ("NHLAD")  on behalf of a proposed "NHLAD Beckman Coulter Class" of similarly situated persons (subject to revision as may be necessary), defined as follows:

> **All white men who, during the applicable statute of limitations 1) were not employed by Danaher or an Opco, 2) applied for a posted position at Beckman Coulter, 3) whose application was screened by Danaher, 4) who met the minimum requirements as recorded in Danaher's records, 5) were not interviewed or hired.**

116.   Plaintiff Farrell brings a subclass pursuant to Federal Rule of Civil Procedure 23 under the Texas Commission on Human Relations Act ("TCHRA") on behalf of a proposed "TCHRA Pall Class" of similarly situated persons (subject to revision as may be necessary), defined as follows:

> **All white men who, during the applicable statute of limitations 1) were not employed by Danaher or an Opco, 2) applied for a posted position at Pall, 3) whose application was screened by Danaher, 4) who met the minimum requirements as recorded in Danaher's records, 5) were not interviewed or hired.**

117.    Plaintiffs have standing to seek the relief sought as stated herein, as Class Representatives are members of the Classes they wish to represent and have been harmed by Danaher's unlawful DEI Policy. The Class Representatives seek to secure relief applicable to themselves and the similarly situated Class members; such relief is properly sought in a class action as much of the necessary relief addresses systemic issues of discriminatory hiring policies that have harmed all Class members and all those who will become Class Members.

### Plaintiffs Satisfy Rule 23(A)

118.    **Numerosity**. The members of the putative classes are so numerous that joinder is practically impossible. Danaher's DEI Policy was enforced with respect to hundreds, if not thousands, of job postings, for which thousands of putative Class Members submitted applications. Based on the number of putative Class Members and their geographic disbursal, joinder is impracticable. The names and addresses of putative Class Members are identifiable through Danaher's records and putative Class Members may be notified of this action by mailed or electronic notice.

119.    **Predominance of Common Questions of Law or Fact**. Class treatment is also appropriate because questions of law or fact common to the putative Classes predominate over any questions affecting only individual members of the putative Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Such common questions include:

    a.   Whether Danaher has engaged in unlawful systemic discrimination on the basis of race and sex/gender, with respect to hiring;

    b.   Whether Danaher intentionally diverted jobs to women and POC applicants disproportionate to the composition of the applicant pool;

    c.   Whether Danaher intentionally denied jobs to white men;

    d.   Whether Danaher's DEI Policy was discriminatory;

    e.   Whether Danaher's DEI Policy established unlawful quotas;

    f.   The appropriate measure of relief and damages to affected Class Members.

120.    Plaintiffs' class claims are amenable to common proof because the central question is whether Defendants' standardized, centralized interview-slate rules and screening procedures used race and sex as criteria for advancing candidates to interview and selection. That question can be resolved based on common evidence, including Defendants' written policies, training materials, centralized reporting, applicant-tracking system data, recruiter workflows, and uniform compliance mechanisms.

121.    The discriminatory impact and intent of Defendants' interview-slate requirements are susceptible to class wide proof through common applicant-flow and requisition-level data maintained by Defendants' centralized recruiting systems, as well as uniform documentation reflecting why candidates were screened out, why requisitions were escalated or reopened, and how slate-composition targets affected interview selection

122.    Certification of the Named Plaintiffs' claims as a class action is the most efficient and economic means of resolving the questions of law and fact common to Plaintiffs' claims and Class claims. Failure to proceed as a class action would result in an impracticable number of individual suits seeking to resolve the same claims arising from the same policy. Proceeding on an

individual basis would further pose an unnecessary risk of inconsistent adjudications. Moreover, individual Class Members face a high threat of being financially unable or unwilling out of fear of retaliation to seek vindication of their statutory rights through the individual claims.

123. Named Plaintiffs raise claims typical of the classes they seek to represent and pursue the same factual and legal theories as the classes they seek to represent and seek similar relief.

124. Danaher's internal records contain sufficient information to identify Class Members.

125. Danaher has been and continues to be engaged in a pattern and practice of hiring practices that discriminate against white male applicants. Danaher's conduct has harmed and affected Named Plaintiffs and Class Members in substantially the same way.

126. Named Plaintiffs are willing and able to represent the interests of the putative classes they seek to represent and will do so fairly and vigorously. Plaintiffs are prepared to assist in this action and make informed decisions to protect the interests of the putative classes.

127. Named Plaintiffs' counsel is experienced in employment discrimination matters and class action litigation and will vigorously prosecute this action on behalf of the putative classes. The experience, knowledge, and resources of Plaintiffs' counsel, together with the assistance of the Named Plaintiffs, satisfy Rule 23's adequacy requirements.

128. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Danaher has acted and/or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiffs and the Class as a whole. The Class Members are entitled to injunctive relief to end Danaher's common, uniform, unfair and discriminatory policies and practices.

129.    Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The Class Members have been damaged and are entitled to recovery as a result of Danaher's common, uniform, unfair and discriminatory policies and practices. The propriety and amount of punitive damages are based on Danaher's conduct, making these issues common to the putative Classes.

130.    Danaher has acted on grounds generally applicable to the putative classes and appropriate injunctive and declaratory relief would apply to and benefit the putative Classes as a whole.

## ALLEGATION REGARDING INJUNCTIVE RELIEF

131.    Named Plaintiffs have no plain, adequate or complete remedy at law to redress the wrongs alleged herein, and the injunctive relief they seek in this action is the only means of securing complete and adequate relief. Named Plaintiffs, and the Classes they seek to represent are now suffering, will continue to suffer, irreparable injury from Danaher's discriminatory conduct.

132.    Danaher's actions have caused and continue to cause Plaintiffs and all Class Members substantial losses in earnings and other employment benefits.

133.    In addition, Plaintiffs and Class Members suffer and continue to suffer emotional distress, humiliation, embarrassment, and anguish, all to their damage in an amount according to proof.

134.    Danaher performed the acts herein alleged with malice or reckless indifference. Plaintiffs and Class Members are thus entitled to recover punitive damages in an amount according to proof.

## Count I

### Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.
### (Sex and Race Discrimination)

135.    Named Plaintiffs repeat and reallege the allegations set forth in Paragraphs 38-134 as though fully set forth herein.

136.    Danaher's conduct, as alleged herein, violated Title VII, which prohibits discrimination on the basis of sex and race.

137.    Danaher discriminated against Named Plaintiffs on the basis of their gender, male, and race, white.

138.    Danaher has engaged in an intentional, company-wide and systematic policy, pattern, and/or practice of discrimination against its white male employees. Danaher has intentionally discriminated against Named Plaintiffs and the Class in violation of Title VII by, among other things:

      a.    Implementing a DEI Policy that favored certain applicants and candidates because of their gender and race, over other applicants and candidates who were of a different sex, male, or race, white.

      b.    Using race as a consideration in hiring decisions;

      c.    Using sex as a consideration in hiring decisions;

139.    Danaher's unlawful employment practices were intentional and done with malice and reckless indifference to Named Plaintiffs' federally protected rights.

140.   As a direct result of Danaher's discriminatory actions, Named Plaintiffs have suffered damages including lost wages, non-monetary damages and attorney's fees.

**WHEREFORE**, Named Plaintiffs seek relief as follows:

a.   Certification of the putative Title VII Class;

b.   Designation of Named Plaintiffs as representatives of the Class;

c.   Designation of Named Plaintiffs' counsel of record as Class Counsel;

d.   A declaratory judgment that the practices complained of herein are unlawful and violate Title VII;

e.   A preliminary and permanent injunction against Danaher and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in policies, patterns and/or practices that discriminate against Named Plaintiff or the Class because of race, sex or participation in this lawsuit;

f.   An order that Defendants institute and carry out policies, practices, and programs that provide equal employment opportunities for all employees regardless of race or sex, and that they eradicate the effects of their past and present unlawful employment practices;

g.   An order requiring Defendants to develop and institute accurate and validated standards for evaluating performance, assigning opportunities, and determining compensation;

h.   An order retaining jurisdiction over this action to ensure that Defendants comply with such a decree;

i.   Monetary damages arising from Danaher's discriminatory conduct;

j.  Exemplary and punitive damages in an amount commensurate with Danaher's ability to pay and to deter future conduct;

k.  Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

l.  Pre-judgment and post-judgment interest, as provided by law; and

m.  Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

**Count II**
**Violation of 42 U.S.C. § 1981**
**(Race Discrimination)**

141.    Named Plaintiffs repeat and reallege the allegations set forth in Paragraphs 38-134 as though fully set forth herein.

142.    Danaher's conduct, as alleged herein, violated 42 U.S.C. § 1981, which prohibits discrimination on the basis of race.

143.    Named Plaintiffs are white and therefore members of a protected class.

144.    Danaher denied Named Plaintiffs employment opportunities based on their race in violation of 42 U.S.C. § 1981.

145.    Plaintiffs' § 1981 claims are based on intentional race discrimination affecting the making and enforcement of employment contracts, including discrimination in recruiting, screening, interviewing, and hiring decisions. Plaintiffs allege race was a but-for cause in the screening-out and non-selection decisions that affected them, including Defendants' explicit focus on "underrepresented" racial categories and the use of race-based interview-slate targets.

146.    Plaintiffs allege facts supporting that Defendants favored candidates because they were members of racial minority groups and disadvantaged Plaintiffs because they were not.

Plaintiffs allege based on Defendants' race-based slate requirements and race-focused reporting—that the decision to exclude Plaintiffs from interview or selection was made to achieve or preserve the required racial composition of the interview slate.

147.    Similarly situated employees that were not white received preferential treatment when applying for internal positions.

148.    Danaher has engaged in an intentional, company-wide and systematic policy, pattern, and/or practice of discrimination against its white employees and applicants. Danaher has intentionally discriminated against Plaintiff and the Class in violation of 42 U.S.C. § 1981 by, among other things:

    a.    Implementing a DEI Policy that favored certain applicants and candidates because of their gender and race, over other applicants and candidates who were white;

    b.    Using race as a consideration in hiring decisions;

149.    As a direct result of Danaher's discriminatory actions, Named Plaintiffs suffered damages including lost wages, non-monetary damages and attorney's fees.

**WHEREFORE**, Named Plaintiffs seek relief as follows:

    a.    Certification of the putative § 1981 Class;

    b.    Designation of Named Plaintiffs as representatives of the Class;

    c.    Designation of Named Plaintiffs' counsel of record as Class Counsel;

    d.    A declaratory judgment that the practice the practices complained of herein are unlawful and violate 42 U.S.C. §§ 1981;

    e.    A preliminary and permanent injunction against Danaher and its officers, agents, successors, employees, representatives, and any and all persons acting in concert

with them, from engaging in policies, patterns and/or practices that discriminate against Named Plaintiffs or the Class because of race or participation in this lawsuit;

f.  An order that Danaher institutes and carries out policies, practices, and programs that provide equal employment opportunities for all employees regardless of race;

g.  An order requiring Defendants to develop and institute accurate and validated standards for evaluating performance, assigning opportunities, and determining compensation;

h.  An order retaining jurisdiction over this action to ensure that Defendant complies with such a decree;

i.  Monetary damages arising from Danaher's discriminatory conduct;

j.  Exemplary and punitive damages in an amount commensurate with Danaher' ability to pay and to deter future conduct;

k.  Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

l.  Pre-judgment and post-judgment interest, as provided by law; and

m.  Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## Count III

### Violation of Massachusetts Fair Employment Practices Act, M.G.L. c. 151B (Sex and Race Discrimination)

150.    Plaintiff Nadeau repeats and realleges the allegations set forth in Paragraphs 38-90 as though fully set forth herein.

151.    Cytiva, Beckman Coulter and Scitex's conduct, as alleged herein, violated MFEPA, which prohibits discrimination on the basis of sex and race.

152.    Cytiva, Beckman Coulter and Sciex discriminated against Plaintiff Nadeau on the basis of his gender, male, and race, white.

153.    Cytiva, Beckman Coulter and Sciex have engaged in an intentional, company-wide and systematic policy, pattern, and/or practice of discrimination against its white male employees. Cytiva, Beckman Coulter and Sciex have intentionally discriminated against Plaintiff Nadeau and the Class in violation of MFEPA by, among other things:

    a.  Implementing a DEI Policy that favored certain applicants and candidates because of their gender and race, over other applicants and candidates who were of a different sex, male, or race, white.

    b.  Using race as a consideration in hiring decisions;

    c.  Using sex as a consideration in hiring decisions;

154.    Cytiva, Beckman Coulter and Scitex's unlawful employment practices were intentional and done with malice and reckless indifference to Plaintiff Nadeau's state protected rights.

155.    As a direct result of Cytiva, Beckman Coulter and Sciex discriminatory actions, Plaintiff Nadeau has suffered damages including lost wages, non-monetary damages and attorney's fees.

**WHEREFORE**, Plaintiff Nadeau seeks relief as follows:

    a.  Certification of the putative MFEPA Classes;

    b.  Designation of Plaintiff Nadeau as representatives of the Classes;

    c.  Designation of Plaintiff Nadeau's counsel of record as Class Counsel;

    d.  A declaratory judgment that the practices complained of herein are unlawful and violate MFEPA;

e.  A preliminary and permanent injunction against Cytiva, Beckman Coulter and Sciex and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in policies, patterns and/or practices that discriminate against Plaintiff Nadeau or the Class because of race, sex or participation in this lawsuit;

f.  An order that Cytiva, Beckman Coulter and Sciex institute and carry out policies, practices, and programs that provide equal employment opportunities for all employees regardless of race or sex;

g.  An order requiring Cytiva, Beckman Coulter and Sciex to develop and institute accurate and validated standards for evaluating performance, assigning opportunities, and determining compensation;

h.  An order retaining jurisdiction over this action to ensure that Cytiva, Beckman Coulter and Sciex complies with such a decree;

i.  Monetary damages arising from Cytiva, Beckman Coulter and Scitex's discriminatory conduct;

j.  Exemplary and punitive damages in an amount commensurate with Cytiva, Beckman Coulter and Scitex's ability to pay and to deter future conduct;

k.  Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

l.  Pre-judgment and post-judgment interest, as provided by law; and

m.  Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## Count IV

**Violation of New Hampshire Law Against Discrimination, RSA 354-A:7**

**(Sex and Race Discrimination)**

156.    Plaintiff Gagne repeats and realleges the allegations set forth in Paragraphs 38-80; 91-98 as though fully set forth herein.

157.    Cytiva and Beckman Coulter's conduct, as alleged herein, violated NHLAD, which prohibits discrimination on the basis of sex and race.

158.    Cytiva and Beckman Coulter discriminated against Plaintiff Gagne on the basis of his gender, male, and race, white.

159.    Cytiva and Beckman Coulter have engaged in an intentional, company-wide and systematic policy, pattern, and/or practice of discrimination against its white male employees. Cytiva and Beckman Coulter have intentionally discriminated against Plaintiff Gagne and the Class in violation of NHLAD by, among other things:

    a.    Implementing a DEI Policy that favored certain applicants and candidates because of their gender and race, over other applicants and candidates who were of a different sex, male, or race, white.

    b.    Using race as a consideration in hiring decisions;

    c.    Using sex as a consideration in hiring decisions;

160.    Cytiva and Beckman Coulter's unlawful employment practices were intentional and done with malice and reckless indifference to Plaintiff Gagne's state protected rights.

161.    As a direct result of Cytiva and Beckman Coulter discriminatory actions, Plaintiff Gagne has suffered damages including lost wages, non-monetary damages and attorney's fees.

**WHEREFORE**, Plaintiff Gagne seeks relief as follows:

    a.    Certification of the putative NHLAD Classes;

    b.    Designation of Plaintiff Gagne as representatives of the Classes;

c.  Designation of Plaintiff Gagne's counsel of record as Class Counsel;

d.  A declaratory judgment that the practices complained of herein are unlawful and violate NHLAD;

e.  A preliminary and permanent injunction against Cytiva and Beckman Coulter and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in policies, patterns and/or practices that discriminate against Plaintiff Gagne or the Class because of race, sex or participation in this lawsuit;

f.  An order that Cytiva and Beckman Coulter institute and carry out policies, practices, and programs that provide equal employment opportunities for all employees regardless of race or sex;

g.  An order requiring Cytiva and Beckman Coulter to develop and institute accurate and validated standards for evaluating performance, assigning opportunities, and determining compensation;

h.  An order retaining jurisdiction over this action to ensure that Cytiva and Beckman Coulter complies with such a decree;

i.  Monetary damages arising from Cytiva and Beckman Coulter's discriminatory conduct;

j.  Exemplary and punitive damages in an amount commensurate with Cytiva and Beckman Coulter's ability to pay and to deter future conduct;

k.  Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

l.  Pre-judgment and post-judgment interest, as provided by law; and

m.  Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## Count V

**Violation of Texas Commission on Human Rights Act, Texas Labor Code § 21.051**
**(Sex and Race Discrimination)**

162.  Plaintiff Farrell repeats and realleges the allegations set forth in Paragraphs 38-80; 99-106 as though fully set forth herein.

163.  Pall's conduct, as alleged herein, violated TCHRA, which prohibits discrimination on the basis of sex and race.

164.  Pall discriminated against Plaintiff Farrell on the basis of his gender, male, and race, white.

165.  Pall has engaged in an intentional, company-wide and systematic policy, pattern, and/or practice of discrimination against its white male employees. Pall has intentionally discriminated against Plaintiff Farrell and the Class in violation of TCHRA by, among other things:

a.  Implementing a DEI Policy that favored certain applicants and candidates because of their gender and race, over other applicants and candidates who were of a different sex, male, or race, white.

b.  Using race as a consideration in hiring decisions;

c.  Using sex as a consideration in hiring decisions;

166.  Pall's unlawful employment practices were intentional and done with malice and reckless indifference to Plaintiff Farrell's state protected rights.

167.  As a direct result of Pall's discriminatory actions, Plaintiff Farrell has suffered damages including lost wages, non-monetary damages and attorney's fees.

**WHEREFORE**, Plaintiff Farrell seeks relief as follows:

36

a.  Certification of the putative TCHRA Classes;

b.  Designation of Plaintiff Farrell as representatives of the Classes;

c.  Designation of Plaintiff Farrell's counsel of record as Class Counsel;

d.  A declaratory judgment that the practices complained of herein are unlawful and violate TCHRA;

e.  A preliminary and permanent injunction against Pall and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in policies, patterns and/or practices that discriminate against Plaintiff Farrell or the Class because of race, sex or participation in this lawsuit;

f.  An order that Pall institute and carry out policies, practices, and programs that provide equal employment opportunities for all employees regardless of race or sex;

g.  An order requiring Pall to develop and institute accurate and validated standards for evaluating performance, assigning opportunities, and determining compensation;

h.  An order retaining jurisdiction over this action to ensure that Pall complies with such a decree;

i.  Monetary damages arising from Pall's discriminatory conduct;

j.  Exemplary and punitive damages in an amount commensurate with Pall's ability to pay and to deter future conduct;

k.  Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

l.    Pre-judgment and post-judgment interest, as provided by law; and

m.    Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## <u>JURY DEMAND</u>

Plaintiffs and putative Class Members hereby demand a trial by jury on all issues of fact and damages stated herein.

Dated: March 16, 2026.

***/s/ George G. Triantis***
GEORGE G. TRIANTIS, ESQ.
D.C. Bar No.: 1671995
MORGAN & MORGAN, P.A.
201 N. Franklin Street, Suite 700
Tampa, FL 33602
Telephone: 813-577-4761
Facsimile: 813559-4870
Gtriantis@forthepeople.com
