UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL NADEAU
140 Deer Run
Colchester, CT 06415
WAYNE GAGNE
49 Tenby Drive
Nashua, NH 03062
PATRICK FARRELL
20323 Pinecreek Ridge Lane
Klein, TX 77397
and all others similarly
situated,

     Plaintiffs,

vs.                                                                          Case No.: 1:26-cv-00923-MJS

DANAHER CORPORATION
2200 Pennsylvania Avenue NW Suite 800W
Washington, D.C. 20037
PALL CORPORATION,
25 Harbor Park Drive
Port Washington, NY 11050
BECKMAN COULTER, INC.
5350 Lakeview Parkway Drive South
Indianapolis, IN 46268
GLOBAL LIFE SCIENCES
SOLUTIONS USA LLC d/b/a CYTIVA
100 Results Way
Marlborough, MA 01752
AB SCIEX LLC d/b/a SCIEX
250 Forest Street
Marlborough, MA 01752

     Defendants.

---

### AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

    Danaher Corporation's ("Danaher") Diversity, Equity and Inclusion Policy ("DEI Policy"),

reaches far beyond ensuring an equal opportunity workplace. It establishes hiring quotas and is the

source of systemic discrimination against applicants who are not members of Danaher's preferred

"underrepresented" groups, including Plaintiffs. The DEI Policy supplies Danaher and its OpCos with a uniform set of race- and sex-based metrics, slate-composition requirements, compliance-reporting requirements, exception procedures, and performance-accountability mechanisms through which Defendants screen applicants and ultimately decide who may advance to interviews and who may be hired. That uniform policy and process is the common thread tying Plaintiffs' claims to the claims of the putative Classes: each Class Member applied through Defendants' centralized hiring system, was screened under the same DEI-driven framework, met the minimum qualifications reflected in application materials or Defendants' records, was not rejected based on position-specific "knockout" criteria pursuant to recruiting records, and was denied an interview, advancement, or ultimate selection.

Plaintiffs Michael Nadeau, Wayne Gagne, and Patrick Farrell (collectively "Named Plaintiffs"), on behalf of themselves and others similarly aggrieved, bring this action to hold Danaher (including its wholly owned subsidiaries, collectively "OpCos")[1] accountable for violating their federally and state protected rights, and in support thereof state:

## <u>NATURE OF THE CLAIMS</u>

1.      Named Plaintiffs, white men, allege they have been discriminated against based on race in violation of 42 U.S.C. § 1981 and sex in violation of Title VII. Named Plaintiffs further allege that Defendants' policies and practices constitute intentional disparate treatment under Title VII, and that Defendants' race-based practices also violate § 1981. The same challenged DEI Policy gives rise to both the individual claims and the class claims.

---

[1] Danaher refers to its wholly owned and indirectly owned subsidiaries as "OpCos." With the exception of Danaher Corporation, Defendants in this action are Danaher OpCos.

2.      Danaher is an American Fortune 200 company. It operates globally, primarily in the life sciences, diagnostics, and biotechnology sectors. Danaher, a conglomerate, is comprised of more than two dozen wholly owned subsidiaries (also referred to as "OpCos"), the largest of which include Cytiva US pass the initial screening,

3.      LLC, Beckman Coulter, Inc., Cepheid, Inc., HemoCue AB, Leica Microsystems GmbH, Leica Geosystems, Inc., Devicor Medical Products, Radiometer America, Inc., Abcam Ltd., Aldevron, LLC, Genedata AG, ID Business Solutions Ltd., Integrated DNA Technologies, Inc., Molecular Devices, LLC, Phenomenex, Inc., and AB Sciex LLC (collectively "Danaher" or "OpCos"). Collectively, Danaher and its subsidiaries employ over 25,000 employees in the United States. Given Danaher's size, the number of OpCos, the number of annual job postings, and the use of a centralized applicant-tracking and screening process, Plaintiffs allege that the putative Classes number at least in the hundreds and likely in the thousands.

4.      Danaher has contracts with the United States Federal Government under which it provides goods and services.

5.      Danaher implemented a DEI Policy that is discriminatory against Plaintiffs and the putative Classes. The same DEI Policy applies across all of the putative Classes. As a direct result of the DEI Policy, qualified white male applicants who are not members of Defendants' preferred "underrepresented" groups, including Plaintiffs, have been systematically denied interviews and selection for positions because Defendants elevated race and sex as criteria in the screening and interview-selection process. Danaher refers to non-whites as People of Color ("POC"). Danaher classifies women and non-whites as "underrepresented."

6.      Danaher has implemented quotas for hiring women and POC. The central mechanism is a mandatory interview-slate composition rule requiring that at least 50% of the

candidates advanced to interview for any posted position be women or "underrepresented." That 50% slate rule is applied uniformly, mechanically, and before any hiring-manager interview, through a common applicant-tracking system, common Talent Acquisition workflows and common demographic reporting requirements. Those same records also make the Classes ascertainable because Defendants' systems identify applicants, positions applied for, applicant demographic classifications, minimum qualifications, screening decisions, interview decisions, requisition outcomes, and whether an applicant was hired.

7.      Danaher's DEI Policy favors women and POC in all aspects of employment while discriminating against white men. Diverse candidates receive hiring opportunities which are not available to white men.

8.      In practice, Defendants' centralized gatekeeping process restricted access to interviews for non-preferred applicants because interview slots were finite and the mandatory 50% slate rule reserved at least half of every interview slate for "underrepresented" candidates, regardless of the demographic composition of the qualified applicant pool.

9.      Danaher's DEI Policy has permeated all aspects of employment at Danaher and its OpCos, and as a result, applicants for employment that are not women or POC have been subjected to unlawful discrimination.

10.      The challenged conduct is not a collection of isolated hiring decisions. It is a centralized policy and practice applied through common systems and common rules. Plaintiffs and Class Members were subjected to the same alleged discriminatory structure: Defendants classified applicants by race and sex, preferred those classified as "underrepresented," and applied a single mandatory rule requiring that at least 50% of every interview slate be "underrepresented," and used centralized screening to determine who could proceed to a hiring-manager interview.

11. Consequently, qualified applicants who were not classified as "underrepresented" were denied equal access to interviews and hiring opportunities because of their race and/or sex.

12. Further, if qualified applicants who were not classified as "underrepresented" pass the initial screening, they were subject to hiring managers whose performance evaluations were tied in part to diversity-related objectives, including objectives that allegedly accounted for up to 20% of their performance metrics.

13. Named Plaintiffs, on behalf of the putative Classes of aggrieved applicants, bring this action to hold Danaher accountable for unlawful discrimination.

**PARTIES**

14. Plaintiff Nadeau is a white male and a citizen of the United States.

15. Plaintiff Gagne is a white male and a citizen of the United States.

16. Plaintiff Farrell is a white male and a citizen of the United States.

17. Defendant Beckman Coulter is a Danaher OpCo and employs over 5,000 employees in the United States.

18. Defendant Cytiva is a Danaher OpCo. Cytiva employs over 5,000 employees in the United States.

19. Defendant Sciex is a Danaher OpCo. Sciex employs over 5,000 employees in the United States.

20. Defendant Pall is a Danaher OpCo and employs over 5,000 employees in the United States.

21. Danaher is the parent company to its OpCos, including Defendants Beckman Coulter, Cytiva, Sciex, and Pall.

22. Danaher Corporation and the operating-company defendants functioned as an

integrated enterprise with respect to the challenged hiring and interview-selection practices.

23.    Danaher and its OpCos constitute a single, integrated enterprise through the Danaher Business System ("DBS")[2].

24.    DBS is not a suggestion to the OpCos. It is a policy and practice which all OpCos must abide by and use in their management and labor relations.

25.    The integrated-enterprise relationship is shown by each recognized factor:

(a) Common Management — Danaher directs and controls the OpCos and their hiring functions through shared executive leadership such as Rainer M. Blair, President and Chief Executive Officer, Georgeann Couchara, Senior Vice President, Human Resources, and Nicole Wormley, Vice President, Diversity, Equity + Inclusion;

(b) Centralized control of labor relations — Danaher set and controlled the DEI Policy and the recruiting, screening, and interview-slate practices in effect at each OpCo;[3]

> a.    Application. This Policy applies to Danaher Corporation and all of its directly and indirectly controlled subsidiaries worldwide, and each of their respective associates.
> b.    Governance. This Policy (including each individual section thereof) has been approved by Danaher Corporation's President and Chief Executive Officer and Senior Vice President-Human Resources.
> c.    Communication. Danaher commits to communicating this Policy to its associates and external stakeholder through Danaher's intranet, external website, annual Sustainability Report and other channels. We also commit to reporting on Danaher's progress and impact with respect to the elements reflected in this Policy in our annual Sustainability Reports.

(c) Interrelation of operations — Danaher and the OpCos operate through a common careers website, a common applicant-tracking system, and common DBS-driven recruiting workflows;[4] and

(d) Common financial control — Danaher wholly owns and controls the finances of

---

[2] https://www.danaher.com/how-we-work/danaher-business-system
[3] Danaher Diversity, Equity and Inclusion Policy, June 10, 2022.
[4] https://jobs.danaher.com/global/en/search-results?keywords=&from=10&s=1

each OpCo. Additionally, the Chief Financial Officer, Matt Gugino, oversees the finances of Danaher and its OpCos.[5] Further, all employee pay and benefits are administered through the same Danaher website.[6]

26. Danaher uses DBS as the operating architecture through which it dictated and translated corporate hiring objectives into mandatory OpCo-level practices, including recruiter instructions, hiring-manager expectations, reporting metrics, escalation procedures, and accountability mechanisms.

27. In the 2024 Proxy Statement, Danaher publicly described Policy Deployment, one of its "most powerful DBS tools," as a rigorous "plan-do-check-adjust" process used to drive progress toward its DE+I goals.

28. Danaher's control goes to the specific employment function at issue in this case: the process by which applicants are screened, placed on interview slates, advanced to interviews, rejected, or selected for employment.

29. Danaher and its OpCos use a common or integrated careers website through which applicants apply for positions at Danaher operating companies.[7]

30. Following clicking on the application, applicants for OpCo positions are directed through Danaher-controlled and Danaher-integrated recruiting systems, policies, and workflows, including DBS-driven recruiting, reporting, and accountability processes, rather than through wholly independent hiring processes maintained separately by each OpCo.

31. Advertising for positions at different OpCos also commonly referred to the employer collectively as "Danaher":

---

[5] https://www.danaher.com/matt-gugino
[6] https://worklife.alight.com/ah-angular-afirst-web/#/web/danaher/cp/preauth-home
[7] https://jobs.danaher.com/global/en/search-results?keywords=&from=10&s=1

**Bring more to life.**

At Danaher, our work saves lives. And each of us plays a part. Fueled by our culture of continuous improvement, we turn ideas into impact – innovating at the speed of life.

Our 63,000+ associates work across the globe at more than 15 unique businesses within life sciences, diagnostics, and biotechnology.

Are you ready to accelerate your potential and make a real difference? At Danaher, you can build an incredible career at a leading science and technology company, where we're committed to hiring and developing from within. You'll thrive in a culture of belonging where you and your unique viewpoint matter.

Learn about the Danaher Business System which makes everything possible.

32.     Danaher's centralized recruiting infrastructure and DBS-based governance gave it practical authority over the composition of interview slates, including enforcement of the 50% "underrepresented" slate requirement, and over whether applicants would be advanced, delayed, rejected, or otherwise dispositioned during the hiring process.

33.     Danaher designed, maintained and administered performance management systems across its OpCos, which aligned with Danaher's discriminatory hiring practices. Specifically, executives and managers were rated on their hiring of female and diverse candidates. In practice, executives and managers were rewarded for hiring female and diverse candidates and penalized for hiring men and non-diverse candidates.

34.     These DBS-driven performance-management and accountability mechanisms reinforced Danaher's centralized hiring directives by tying managerial evaluation, compliance, and accountability to the demographic composition of candidate slates and hiring outcomes.

35.     DBS is not merely a set of aspirational corporate values: it is the operating system through which Danaher implements, monitors, and enforces companywide business and employment requirements across its OpCos.

36.     Danaher and its OpCos further demonstrated common control and integrated operations through shared corporate leadership, coordinated shareholder and governance communications, common reporting structures, centralized oversight of employment-related

8

policies and practices, and DBS-driven performance requirements.[8]

**ABOUT DANAHER**

Danaher is a global science and technology innovator committed to helping its customers solve complex challenges and improving quality of life around the world. Its family of world class brands has leadership positions in the demanding and attractive health care, environmental and applied end-markets. With more than 20 operating companies, Danaher's globally diverse team of approximately 81,000 associates is united by a common culture and operating system, the Danaher Business System, and its Shared Purpose, *Helping Realize Life's Potential*. For more information, please visit www.danaher.com.

37.     Danaher also maintained the authority and practical control to enforce compliance with its hiring and interview-slate requirements, including through DBS escalation procedures, compliance monitoring, and performance accountability mechanisms. Through these means, Danaher exercised direct and indirect control over the challenged employment decisions sufficient to be treated as an employer under Title VII and as a contracting party or entity interfering with contractual rights under § 1981. Alternatively, because Danaher exerted significant control over the terms and conditions of its OpCos' employees and applicants, Danaher is a joint-employer of its OpCos' employees and joint employer with respect to the hiring of applicants.

38.     In determining whether Danaher was an employer or joint employer under Title VII, courts in this Circuit consider the totality of the circumstances under the common-law agency "hybrid" test, with the right to control the work and the employment relationship as the most important consideration. Danaher's centralized, mandatory gatekeeping rules for recruiting, screening, and interview advancement satisfy this standard.

---

[8] https://investors.danaher.com/2023-08-16-Danaher-Releases-2023-Sustainability-Report

39.    Danaher exercised substantial control over the means and manner of the challenged DEI policy and the centralized recruiting and screening process that implemented it such that Danaher qualifies as an employer and/or joint employer for purposes of Title VII.

40.    Danaher's centralized control included, among other things:

(a)    ownership and/or administration of the applicant tracking system used for the requisitions at issue;

(b)    required standardized recruiting stages and dispositions;

(c)    centralized Talent Acquisition personnel responsible for screening and slate creation;

(d)    mandatory interview-slate composition rules requiring that at least 50% of each interview slate be "underrepresented" before the slate could be released to a hiring manager;

(e)    centralized dashboards and reporting that tracked interview slate composition and hiring outcomes by race and sex;

(f)    escalation and enforcement mechanisms when a requisition's slate did not satisfy required demographic targets, including delaying, reopening, or extending requisitions until compliance was achieved;

(g)    centralized guidance, training materials, and recruiter playbooks instructing personnel how to operationalize "underrepresented" slate requirements; and

(h)    centralized compliance monitoring and periodic reporting to Danaher leadership regarding slate composition and hiring outcomes.

## JURISDICTION AND VENUE

41.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because

10

this action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981.

42.     The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a) because those claims are so closely related to the federal claims in this case that they form part of the same case or controversy under Article III of the United States Constitution. Plaintiffs' federal and state law claims arise from the same facts and would ordinarily be expected to be resolved in one judicial proceeding. Further, all claims arise from the same DEI Policy, the same centralized hiring process, the same interview-slate requirements, and the same denial of interviews, advancement, or hiring opportunities based on race and sex.

43.     This Court has general personal jurisdiction over Defendant Danaher because Danaher's principal place of business, corporate headquarters, nerve center, and center of corporate direction and control are located in the District of Columbia. Additionally, Danaher's senior corporate leadership, enterprise governance, and centralized employment-governance functions operate from this District.  Danaher is therefore at home in this District and may be sued here on claims arising from its companywide policies and employment practices.

44.     Each OpCo Defendant used and purposefully directed hiring-related activity to the Danaher-controlled recruiting infrastructure at Danaher's District of Columbia headquarters by participating in enterprise recruiting governance, submitting or maintaining applicant and hiring data within Danaher-controlled systems, accepting Danaher Talent Acquisition and DBS requirements, and implementing recruiting directives issued or monitored by Danaher from the District of Columbia.

45.     Additionally, each OpCos' District-based contacts are directly connected to the claims asserted in this action because Plaintiffs challenge a centralized, companywide DEI Policy

and related recruiting, screening, interview-slate, and hiring practices that Danaher developed, directed, monitored, and enforced from its District of Columbia headquarters.

46.     This Court has specific personal jurisdiction over Defendants Beckman Coulter, Cytiva, Sciex, and Pall because Plaintiffs' claims arise from and are directly connected to those Defendants' purposeful participation in the Danaher Business System ("DBS") which controls all corporate, recruiting, hiring, and employment-governance system, including the centralized recruiting, hiring, and employment-governance systems furthered by the DEI Policy.

47.     Defendants Beckman Coulter, Cytiva, Sciex, and Pall each transacted business in the District of Columbia within the meaning of D.C. Code § 13-423(a)(1) by participating in, accepting the benefits of, implementing, and complying with Danaher's centralized recruiting infrastructure, hiring policies, interview-slate requirements, reporting obligations, and employment-governance directives that were issued, administered, monitored, and enforced from Danaher's District of Columbia headquarters.

48.     Danaher's and the OpCo Defendants' District-based contacts are directly connected to the claims asserted in this action because Plaintiffs challenge a centralized, companywide DEI Policy and related recruiting, screening, interview-slate, and hiring practices that Danaher allegedly developed, directed, monitored, and enforced from its District of Columbia headquarters, and that the OpCo Defendants implemented.

49.     Exercising jurisdiction over Beckman Coulter, Cytiva, Sciex, and Pall is consistent with due process because each purposefully participated in the District-directed system giving rise to Plaintiffs' claims and could reasonably anticipate being sued in this District for injuries caused by that system.

50.     Thus, this Court has personal jurisdiction over Defendants Danaher, Beckman

Coulter, Cytiva, Sciex, and Pall.

51.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District and because Danaher is subject to this Court's personal jurisdiction with respect to this civil action.

<strong><u>ADMINISTRATIVE PREREQUISITES</u></strong>

52.     Plaintiff Nadeau has exhausted his administrative remedies and complied with all statutory prerequisites to his Title VII claims against Beckman Coulter, AB Sciex LLC d/b/a Sciex and Cytiva.

53.     Plaintiff Gagne has exhausted his administrative remedies and complied with all statutory prerequisites to his Title VII claims against Cytiva and Beckman Coulter.

54.     Plaintiff Farrell has exhausted his administrative remedies and complied with all statutory prerequisites to his Title VII claims against Danaher and Pall.

55.     Plaintiff Nadeau brings this action within 90 days of receiving his Notice of Right to Sue.

56.     Plaintiff Gagne brings this action within 90 days of receiving his Notice of Right to Sue.

57.     Plaintiff Farrell brings this action within 90 days of receiving his Notice of Right to Sue.

58.     Each Title VII plaintiff timely filed an EEOC charge alleging the discriminatory hiring practices described herein and received a Notice of Right to Sue. Each such plaintiff filed this action within ninety (90) days of receipt of that Notice. The discriminatory practices challenged in this Complaint were within the scope of the EEOC investigation that could reasonably be expected to grow out of the charges. The charges challenged the same common

course of conduct alleged here: Defendants' use of DEI hiring practices to deny applicants interviews, advancement, and hiring opportunities based on sex and race.

59.    To the extent Defendants contend that any related entity was not explicitly named in a charge, Plaintiffs allege that the entities functioned as an integrated enterprise and/or joint employers with shared control over the challenged hiring practices, and that the EEOC charge allegations put Defendants on notice of the centralized, companywide nature of the discriminatory screening and slate-composition requirements.

60.    All other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

### *Danaher's DEI Policy*

61.    For all times relevant to Plaintiffs' allegations, Danaher has maintained a DEI policy. The DEI Policy applies to all aspects of employment throughout the Danaher system[9]:

> This Diversity, Equity and Inclusion Policy (the "Policy") sets out the principles upon which Danaher's D+I program is based and the requirements applicable to our employees (whom we refer to as "associates") and businesses. This policy applies to (among other topics) our practices and policies on talent acquisition and selection; compensation and benefits; development and training, career growth, associate engagement and inclusion; and transitions. In this Policy, we refer to Danaher and its directly and indirectly controlled subsidiaries worldwide as "Danaher".

62.    Danaher's DEI Policy begins at the very beginning of the hiring process. Specifically, Danaher created and implemented a Diverse Talent Attraction Guide, which governed how Danaher sourced, screened, tracked, and advanced applicants for open positions across Danaher and its OpCos.

63.    The Diverse Talent Attraction Guide specifically states that Danaher would drive results through a DEI scorecard. The DEI scorecard supplied a common metric and common

---

[9] Consistent with Danaher's DEI Policy, Danaher and its "directly and indirectly controlled" subsidiaries are referred to collectively as "Danaher" unless otherwise specified.

accountability mechanism by which Danaher and its OpCos measured hiring activity, candidate pipelines, interview slates, and hiring outcomes by race, sex, POC status, and/or "underrepresented" status.



64.    In the Guide, Danaher boasts about taking race into account when hiring and how it improved the number of Asian people hired:

**PROBLEM**

Danaher wanted to close a recruitment gap by attracting and hiring Asian talent to fill Corporate HR roles.

**PROCESS**

- Assessed existing candidate outreach strategy to identify areas of improvement for reaching Asian talent pool
- Created enhanced tools to ensure that Danaher's TA community reached the targeted talent pool for every external talent search
- Conducted thorough research into highly ranked Asian schools and professional organizations; incorporated research findings into search tools to ensure that identified schools and organizations would be included in every external talent search
- Provided the recruitment team with easy access to enhanced search tools; supported their efforts to leverage tools in broad scale outreach campaigns designed to attract targeted talent pool

**OUTCOME**

- Increased Asian talent pipeline by 2 points from 2021 (from 12% to 14%), despite having only half the hiring opportunities that were available in 2021
- Drove an additional 144 Asian candidates to apply in 2022 (as compared to 2021); added these candidates to our pipeline for future opportunities

To learn more, please contact:

**Caitlin Lowe**
Senior Talent Advisor at Danaher Corporation
caitlin.lowe@danaher.com

65.    Danaher implemented and enforced a centralized, companywide hiring and interview-screening process that operated as a mandatory gatekeeping step for positions across Danaher operating companies. Under this process, candidates were first screened by centralized Talent Acquisition personnel using a common applicant-tracking system and standardized screening stages before any hiring manager interview could occur. This centralized gatekeeping

15

process is the mechanism through which the DEI Policy was applied to Plaintiffs and the putative

Classes.

66.    This was not a suggestion but a requirement[10]:

> DE + I. We seek to continuously improve and sustain a diverse, equitable and inclusive culture free of systemic bias and where all associates feel they belong. We believe a diverse workforce and culture of inclusion is essential to drive innovation, fuel growth and help ensure our technologies and products effectively serve a global customer base. Danaher's Office of Diversity, Equity + Inclusion is led by our Vice President of Global Diversity, Equity + Inclusion, who is responsible for the execution of Danaher's DE+I strategy and reports to Danaher's Senior Vice President of Human Resources. Our DE+I strategy includes a focus on creating DE+I accountability measures; and operationalizing DE+I initiatives, learnings, and programming across our businesses.
>
> We have leveraged DBS with the goal of driving progress on diversity representation and inclusive culture, including by requiring our operating companies as applicable to implement a DE+I Policy Deployment initiative in each of 2021, 2022 and 2023. Policy Deployment is a DBS tool designed to achieve strategic breakthroughs. Our DE+I initiatives focus on broadening our candidate pools, sourcing diverse slates in the hiring process, developing people leaders' competency in and accountability for DE+I and implementing and sustaining programs (such as our Associate Resource Groups for Women, Black, Latinx, LGBTQ and Asian descent associates and friends/allies) that offer mentorship, support and engagement to help our associates succeed and thrive. As of December 31, 2023, (1) 40% of our total associates were female and females represented 35%, 37% and 41% of our executives/senior leaders, managers and individual contributors, respectively; and (2) 42% of our total U.S. associates were People of Color and People of Color represented 25%, 34% and 44% of our U.S. executives/senior leaders, managers and individual contributors, respectively.
>
> In support of our DE+I commitment, we conduct regular pay reviews from a race (in the United States) and gender (globally) perspective that serve to proactively identify and address potential pay differences. Based on our reviews, we have achieved pay equity in the U.S. by gender and by race and ethnicity, and have also achieved base pay equity for women globally.

67.    Since at least 2021, Danaher imposed DEI requirements upon its subsidiaries

through its DE&I Policy Deployment Initiative. *Danaher Corp. Dec. 31, 2023, Form 10-K. p. 9.*

---

[10] Danaher 2023 Annual Report.

**Application, Governance and Communication**

    a.    Application. This Policy applies to Danaher Corporation and all of its directly and indirectly controlled subsidiaries worldwide, and each of their respective associates.

    b.    Governance. This Policy (including each individual section thereof) has been approved by Danaher Corporation's President and Chief Executive Officer and Senior Vice President-Human Resources.

    c.    Communication. Danaher commits to communicating this Policy to its associates and external stakeholder through Danaher's intranet, external website, annual Sustainability Report and other channels. We also commit to reporting on Danaher's progress and impact with respect to the elements reflected in this Policy in our annual Sustainability Reports.

*Policy revised June 10, 2022*

68.    The DEI Policy establishes a standardized approach for evaluating potential hires, with decisions dictated by numeric racial and gender-based quotas. In practice, Danaher and its OpCos operationalized these quotas through mandatory demographic interview-slate composition rules and centralized gatekeeping constraints on who could be advanced to interviews. As further described herein, in reality, the DEI Policy was a quota system that discriminated against white men on the basis of their race and sex/gender. These practices were implemented through centralized screening and slate controls, not merely aspirational statements.

69.    The DEI Policy classifies people who are not white as "People of Color" ("POC"). Women and POC, in combination, are considered "under-represented."[11]

70.    The DEI Policy provides for preferential consideration for women and POC, which as will be further explained below, caused Plaintiffs to not be hired and/or interviewed for positions they were qualified for while POC and/or women were hired instead of Plaintiffs.

71.    There is nothing unlawful about striving to ensure an organization offers equal employment opportunities to everyone. There are several federal, state and local laws intended to

---

[11] Danaher's definition of "POC" and "underrepresented," and which groups of people are covered in which instances, is presently unknown. Regardless, white men (and perhaps other races) are not covered and are therefore subjected to unlawful discrimination.

17

prevent workplace discrimination and hold employers accountable for discrimination based upon protected characteristics such as race and sex. In fact, in March 2025, the EEOC issued a policy statement on DEI, echoing equal application of Title VII to everyone:

> Diversity, Equity and Inclusion (DEI) is a broad term that is not defined in Title VII of the Civil Rights Act of 1964 (Title VII). Title VII prohibits employment discrimination based on protected characteristics such as race and sex. Under Title VII, DEI initiatives, policies, programs, or practices may be unlawful if they involve an employer or other covered entity taking an employment action motivated—in whole or in part—by an employee's or applicant's race, sex, or another protected characteristic.

72.     Danaher's DEI-driven policies and practices far exceeded the bounds of the EEOC's guidance, requiring that race and gender must be considered when evaluating applicants at Danaher and its OpCos. The DEI Policy is discriminatory, and the source of unlawful and discriminatory employment practices.

**50% Interview-Slate Requirement**

73.     For example, Danaher's DEI Policy **required that 50% of candidates** interviewed for open positions be from "underrepresented" populations. This requirement was a fixed numerical rule, not a goal or aspiration, and applied uniformly to posted positions across Danaher and its OpCos.



**Targeting Diversity of Slates and Hires**

Implementing diverse slates at Danaher and across OpCos is a strategy with the goal to have 50% underrepresented candidates interviewed.

Diverse slates show the possibility and range of qualified talent available in the market, which may include prospects, passive profiles, or active candidates. By taking these discreet and specific actions to broaden candidate pools, we help increase the diversity of candidates.

Through these intentional diversity recruitment efforts, Danaher can accelerate our talent outreach and maximize the chances of hiring the most qualified candidate of every gender, race, and ethnicity.

74.    In practice, Danaher and its OpCos treated the "50% underrepresented interviewed" requirement as a mandatory gatekeeping condition: candidate slates could not be released for interviews, and requisitions could be delayed or escalated, unless and until the slate satisfied the required demographic composition. Because this rule operated before and independent of any hiring-manager judgment, it decided in a single, uniform step which applicants could reach an interview whenever a requisition lacked a slate satisfying Defendants' 50% "underrepresented" metric or required an exception approval before proceeding.



75.    Additionally, if an interview slate did not match the required demographic metric, Defendants required a "No Diverse Slate Offer Exception Form":

Effective October 3, 2022 all open external requisitions will require L1 approval **BEFORE** an offer can be made to a candidate when no diverse slate was achieved –

This applies to all external fills for O, B, T, P, M, E roles regardless of GCRF level/band, and shall be applied globally

Primary recruiter is responsible to submit exception request form direct to L1 (Managers reporting to Pall President) using this link No Diverse Slate Offer Exception Form –

19

76.     The "No Diverse Slate Offer Exception Form" demonstrates that Danaher and its OpCos monitored whether interview slates satisfied the demographic requirements and required justification or approval when a slate did not contain the expected number of women, POC, or "underrepresented" candidates.

77.     The use of an exception form further demonstrates that the DEI Policy was not merely aspirational. Rather, Danaher and its OpCos tracked compliance at the requisition and slate level and required additional documentation when the demographic composition of the slate failed to meet Defendants' requirements.

78.     Further, because interview slots were finite, reserving interview-slate capacity for "underrepresented" candidates necessarily reduced interview opportunities for qualified applicants who were not classified as "underrepresented."

79.     Danaher's DEI Policy is anything but "discreet." By its own terms, it is "specific" and "intentional," manipulating the composition of interview slates consistent with the DEI Policy and functional hiring quotas.

80.     Women and POC have comprised less than 50% of the qualified pool for Covered Positions. By artificially populating an interview pool with under-represented candidates disproportionate to the applicant pool, Danaher discriminated against applicants who were not from an underrepresented group. White men were disproportionately not hired and excluded from the interview pool because Danaher was motivated by race and sex when selecting candidates for open positions.

81.     Although some Danaher materials used the word "goal," Defendants operationalized the 50% metric as a mandatory gating requirement by tracking slate composition at the requisition level, requiring L1 approval before an offer could be made when no diverse slate

was achieved, using slate-compliance dashboards, and delaying, reopening, or escalating requisitions until the required demographic composition was achieved.

82.    The 50% slate rule is a single, uniform, mechanical gating rule that operated on every Class Member's application in the same way and before any individualized hiring-manager judgment.

83.    Whether that rule used race and sex to allocate finite interview opportunities is a common question capable of classwide resolution in one stroke: the rule reserved at least half of every interview slate for "underrepresented" candidates.

84.    Resolving that question does not require the Court to examine the discretionary reasons any individual hiring manager later selected one interviewed candidate over another, because the challenged injury, exclusion from the interview slate itself, occurred at the centralized, non-discretionary 50% gate.

**Centralized Talent Acquisition, Applicant Tracking and Uniform Hiring Steps**

85.    Danaher implemented and dictated the DEI Policy throughout the Danaher system, including its OpCos through centralized Talent Acquisition procedures, applicant-tracking systems, standardized hiring workflows, DEI scorecards, interview-slate requirements, and reporting mechanisms.

86.    Danaher's centralized Talent Acquisition Department ("Talent Acquisition") controlled the recruiting and hiring process for open positions and implemented Danaher's DEI Policy therein.

87.    Talent Acquisition collected applications for open positions. It screened applicants to create a slate of candidates for the hiring manager to interview. That is, it made an initial determination as to which applicants progressed to the "candidate" stage in the hiring process.

21

88.    Talent Acquisition was provided an Inclusive Hiring Playbook that set forth standardized steps for recruiting, screening, interviewing, and advancing candidates.

89.    The Inclusive Hiring Playbook required recruiters and hiring personnel to follow the same or substantially similar hiring steps across positions, thereby creating common procedures applicable to Plaintiffs and the putative Classes.

In 2019, the diverse slate requirement that was implemented globally for all Professional, Manager and Executive career bands was a specific action to help increase the diversity of candidate pools.

90.    Applicants that did not progress out of the candidate stage did not have an opportunity to interview with the hiring manager and were effectively "rejected" for the position. Only candidates selected for interview remained in contention for the position.

91.    Because the centralized screening process occurred before hiring-manager interviews, the DEI Policy and related slate-composition requirements operated with no independent hiring-manager decisions at the screening stage.

## Job Requirement Manipulation

92.    Danaher modified job descriptions and requirements to "open the aperture" to diverse applicants. That is, diverse applicants did not have to meet the same job requirements as applicants that were not diverse, *i.e.* white men.

93.    Danaher modified job requirements for diverse applicants to ensure Danaher satisfied its race and sex/gender driven hiring quotas.

94.    Diverse candidates that satisfied the "flexible" job requirements were placed on a shortlist to be interviewed by the hiring manager. The shortlist was an advantage specifically reserved for diverse candidates. There was no shortlist for non-diverse applicants. Put differently,

there were different standards for applicants based on race and sex/gender.

95.    Only *after* Talent Acquisition performed its initial screening were interview slates presented to the hiring manager for interviews. Hiring managers were presented with a pre-selected shortlist of diverse candidates. There was no shortlist for non-diverse candidates.

### Classwide Effect of the Screening Process

96.    In practice, the centralized screening process required that interview slates (including the subset of candidates advanced to interviews) satisfy predetermined demographic targets, including targets based on race and sex. These requirements were not aspirational statements of equal opportunity; they were enforced operational constraints that controlled which candidates could advance past screening and into interview stages for posted roles.

97.    As a direct result of these enforced demographic screening rules, similarly or more qualified non-diverse applicants were routinely delayed, deprioritized, or rejected at the screening stage—before any individualized assessment by a hiring manager—because advancing them would have prevented the slate from meeting the required demographic composition.

98.    Danaher required that 50% of interviewed candidates be diverse or female candidates. This far exceeded the percentage of diverse or female applicants in the initial applicant pool. As a result, Danaher discriminatorily under hired white males after implementing this systemically discriminatory DEI policy/practice.

99.    Interview slates consisted of a disproportionately high percentage of females and diverse candidates relative to the overall applicant pool.

23

100.    Because there were a finite number of applicants selected for interviews with the hiring manager, white men were disproportionately deprived of interview opportunities relative to their representation in the applicant pool.

101.    This process has limited merit-based selection and steered outcomes toward compliance with demographic quotas rather than job-related criteria. Even when a hiring manager later exercised discretion, the centralized gatekeeping step constrained which applicants could ever reach the manager for consideration.

### DEI Performance Objectives, Manager Accountability, and Enforcement

102.    Danaher encouraged discriminatory hiring practices. Hires that moved Danaher closer to its functional quotas were considered wins; hiring decisions that were not aligned with Danaher's objectives were considered losses.

103.    Hiring managers faced pressure to increase minority representation to meet Danaher's diversity objectives, reinforcing the company's quota-driven approach to hiring.

104.    Danaher required its leaders to follow DEI Performance Objectives. Performance objectives were tied to Diversity & Equity priorities.

105.    Danaher tracked compliance with these demographic interview-slate requirements through centralized reporting and governance, including regular reporting on interview slate composition and hiring outcomes by race and sex and escalation when a requisition's slate did not meet the required demographic criteria. Danaher incentivized and enforced compliance through performance objectives, metrics, and managerial accountability tied to hiring decisions.

106.    Danaher tethered manager performance evaluations, career advancement opportunities and compensation to meeting DEI Policy objectives. Managers who did not meet

Danaher's *de facto* quotas received lower performance evaluations, less career advancement opportunities and lower discretionary compensation.



107.    To further its unlawful and discriminatory hiring practices, compliance with Danaher's DEI objectives was a critical component of management performance evaluations.  For example, the "People & Culture" category was 15-25% of a manager's overall performance review.   Within "People and Culture," managers were instructed to "Strengthen DEI and female…from X to Y (PD Goal)," "Strengthen DEI position" and "Improvement in Regional DEI position." By tethering performance evaluations with DEI-driven policy objectives intended to increase female and POC workforce representation to meet its quotas, Danaher forced decisionmakers to consider race and sex in hiring decisions.

### *The DEI Policy in Application*

108.    Danaher's DEI Policy is discriminatory against applicants that are not diverse or underrepresented. For example, Danaher's 2024 Sustainability Report proclaimed success because over two-thirds (68%) of its new hires in the United States in 2023 were women and/or POC, and POC represented 42% of its workforce:

- 63,000 associates in more than 50 countries
- Invested nearly $12 million in our communities in 2023, focused on Building a Diverse, STEM-ready Workforce, Advancing Healthcare Innovation and Protecting the Environment
- Adopted a Diversity, Equity and Inclusion Policy
- 40% of 2023 global new hires were women, and at the end of 2023 women represented 40% of our global workforce
- 68% of 2023 U.S. new hires were women and/or People of Color (POC), and at the end of 2023 POCs represented 42% of our U.S. workforce
- Maintained total direct compensation pay equity for women globally and for racial and ethnic minorities in the U.S.

- Women represent 40% of global workforce by 2025
- POC represent 38% of U.S. workforce by 2025
- 100% total direct compensation pay equity annually



109.    Put another way, Danaher celebrated success because less than 1/3 of people it hired in the United States in 2023 were white men.

110.    Women and POC applicants received preferential hiring treatment because of their gender and race. White men made up far more than 1/3 of the qualified applicant pool but were less than 1/3 of Danaher's hires.

111.    Danaher discriminated against white men, who were disproportionately rejected for employment because Danaher unlawfully considered sex/gender and race in hiring decisions.

112.    Danaher's recruiters and Talent Acquisition personnel had access, within the applicant-tracking system and related recruiting tools, to information reflecting or permitting inference of applicants' race and sex, including applicants' voluntary EEO self-identification data and recruiter-visible demographic indicators used for compliance reporting and interview-slate composition.

113.    In addition, the centralized screening process was designed specifically to monitor and control candidate slates by race and sex, which necessarily required that Danaher and its OpCos identify candidates' demographic status at or before the interview-selection stage. Danaher and its OpCos therefore acted with knowledge of Plaintiffs' protected characteristics when Plaintiffs were screened out, denied interviews, or denied selection.

114.    Defendants conducted "slate compliance" checks using recruiter dashboards or reporting tools that reflected candidates' demographic status, and the centralized Talent Acquisition personnel used those tools to determine which applicants could advance to interview stages consistent with the "underrepresented" slate requirement.

115.    Plaintiffs are informed and believe, and allege based on Danaher's published Diverse Talent Attraction Guide, the Inclusive Hiring Playbook, the No Diverse Slate Offer Exception Form, Danaher's Form 10-K and Sustainability Report, and the stated DEI requirements quoted herein, that Danaher and its OpCos' decision to advance or reject candidates at the screening stage was influenced by candidates' race and sex to satisfy the mandated slate composition requirements.

116.    Plaintiffs do not rely solely on the conclusory assertion that every selectee was "less qualified." Instead, Plaintiffs allege that the screening process excluded Plaintiffs at an early stage despite Plaintiffs meeting posted qualifications and despite Danaher and its OpCos continuing the selection process, supporting the inference that protected traits influenced which candidates were advanced to interview and selection.

117.    When a qualified applicant is denied the opportunity to interview for a position because of their race or sex, it is an adverse employment action, regardless of whether they would have ultimately been selected for the position. Without the opportunity to interview, the excluded applicant has no chance of getting the job. Similarly, they are deprived of the networking opportunity and experience of interviewing for more advanced or different positions.

118.    The same DEI Policy, the same "underrepresented" classification, the same 50% interview-slate requirement, the same centralized Talent Acquisition gatekeeping process, and the same compliance-reporting structure apply across Plaintiffs' claims and the proposed Classes.

119.    Danaher's conduct is not a collection of isolated hiring decisions. It is a centralized policy and practice applied through common systems and common rules. Plaintiffs and Class Members were subjected to the same alleged discriminatory structure: Defendants classified applicants by race and sex, preferred those classified as "underrepresented," required interview slates to satisfy demographic targets, and used centralized screening to determine who could proceed.

*Plaintiff Nadeau*

120.    Plaintiff Nadeau is a white man.

121.    Plaintiff Nadeau's sex and race were known by Danaher, Cytiva, Sciex, and Beckman Coulter through his application materials (including the voluntary EEO self-identification fields he completed) and their applicant-tracking, demographic-monitoring, and other hiring systems during the hiring process.

122.    Plaintiff Nadeau was subjected to unlawful discrimination based upon his race and sex.

123.    Plaintiff Nadeau has over 30 years of experience in the relevant fields, including substantial experience in senior leadership, global service, operations, and other business functions.

124.    Plaintiff Nadeau performed at a level commensurate with senior leadership roles and was qualified for senior-level roles within Danaher's and its OpCos' business units, including positions at Danaher, Cytiva, Sciex and Beckman Coulter. Plaintiff Nadeau applied for multiple positions, for which he was qualified at Danaher, Cytiva, Sciex and Beckman Coulter.

125.    Specifically, Plaintiff Nadeau applied for OptiRun Service Center Manager, Account Manager, GoSilico Sales Specialist and Technical Sales Consultant.

126.    For each such position, Plaintiff Nadeau applied through Danaher's applicant tracking system. Plaintiff Nadeau was an external applicant at the time he applied all of the positions at issue.

127.    The positions Plaintiff Nadeau sought were senior-level roles requiring substantial leadership, global service, operations, business-function, and industry experience, all of which Plaintiff Nadeau possessed based on his more than thirty years of relevant experience.

128.    The posted requirements for the OptiRun Service Center Manager, Account Manager, GoSilico Sales Specialist and Technical Sales Consultant positions included senior leadership experience, experience managing global service functions, operational experience, business-unit experience, and/or experience leading teams in the relevant industry.

129.    Plaintiff Nadeau met or exceeded all of the requirements of the posted positions at Danaher, Cytiva, Sciex and Beckman Coulter.

130.    Despite meeting the requirements, Plaintiff Nadeau was denied the opportunity to interview and was not hired for the positions for which he applied.

131.    Plaintiff Nadeau was more qualified than, or at minimum comparably qualified to, the individuals advanced or selected for the positions because of his more than thirty years of relevant experience, senior leadership experience, global service experience, operational experience, and stronger industry background.

132.    For each position, Defendants' requisition records identify the applicants advanced to interview, the applicant ultimately selected, and the demographic classification used for slate-compliance reporting. Plaintiffs allege, based on those requisition dispositions and Defendants' demographic slate records, that the candidates advanced or selected for the positions Nadeau sought were treated by Defendants as "underrepresented," while Nadeau was not.

29

133. Based on requisition status (including "offer closed," "filled," and/or similar disposition codes) and the continued progression of other candidates, Plaintiff Nadeau was screened out at the centralized gatekeeping step and denied the opportunity to interview.

134. Danaher's and its OpCos' centralized talent acquisition personnel controlled which applicants would be advanced to hiring managers and which applicants would be screened out before any hiring-manager interview pursuant to the DEI Policy.

135. The decision to screen Plaintiff Nadeau out was based on the DEI Policy and related hiring and advancement framework, which favored candidates considered "underrepresented" over white male candidates, including Plaintiff Nadeau.

136. Under the DEI Policy and related hiring and advancement framework, Plaintiff Nadeau, as a white man, was not considered "underrepresented."

137. Because Danaher and its OpCos required the advancement of "underrepresented" candidates for interview slates, the screening process disadvantaged Plaintiff Nadeau because of his race and sex.

138. Specifically, the positions for which Plaintiff Nadeau was qualified were filled by a female candidate or a person of color whom Danaher and its OpCos treated as "underrepresented" under the DEI Policy and related hiring and advancement framework. The selected candidates also had less senior leadership, global service, operations, and/or industry experience than Plaintiff Nadeau.

139. Danaher and its OpCos advanced other candidates to interviews and filled the positions for which Plaintiff Nadeau applied after screening Plaintiff Nadeau out.

140. Plaintiff Nadeau alleges that his screening-out occurred under circumstances supporting an inference of discrimination, including the mandatory "underrepresented" slate

requirements, the finite number of interview slots available for a given requisition, and the effect of centralized screening decisions that limited who could reach the hiring manager stage.

141. The inference of discrimination is further supported by Plaintiff Nadeau's superior or comparable qualifications, his exclusion from interviews despite meeting the posted requirements, the advancement of non-white-male and "underrepresented" candidates, and Danaher's and its OpCos' use of race- and sex-conscious hiring and slate requirements.

142.

143. The centralized gatekeeping and screening process operated to exclude Plaintiff Nadeau from interview consideration because he is a white man and therefore not considered "underrepresented" under Danaher's DEI Policy and related hiring and advancement framework.

144. Plaintiff Nadeau suffered an adverse employment action because he was denied the opportunity to interview for positions because of his race and sex.

145. Additionally, Plaintiff Nadeau suffered an adverse employment action because he was not hired for positions because of his race and sex.

146. Danaher and its OpCos factored race and sex into their hiring decision-making, including decisions about which applicants would advance to interviews and which applicants would be screened out before reaching the hiring manager stage.

147. Plaintiff is ready, willing and able to apply for employment with Danaher or its OpCos in the future and is presently deterred by the challenged policies.

### *Plaintiff Gagne*

148. Plaintiff Gagne is a white man.

149. Plaintiff Gagne's sex and race were known by Danaher, Cytiva, and Beckman Coulter through his application materials (including that he previously worked for the Company)

and Defendants' applicant-tracking, demographic-monitoring and other hiring systems during the hiring process.

150.   Plaintiff Gagne was subjected to unlawful discrimination based upon his race and sex.

151.   Plaintiff Gagne was a highly qualified applicant with approximately fifteen (15) years of prior experience with Danaher-affiliated companies, including substantial experience with Beckman Coulter and Cytiva. In his previous roles, Plaintiff Gagne performed at a high level.

152.   Plaintiff Gagne applied for multiple positions, including Regional Sales Manager, for which he was qualified at Danaher, Cytiva and Beckman Coulter.

153.   At the time he applied for these positions, Plaintiff Gagne was an external applicant.

154.   Plaintiff Gagne interviewed for the Regional Sales Manager position in or around December 2024.

155.   The Regional Sales Manager position required relevant sales, account-management, business-development, management, customer-support, and/or industry experience, all of which Plaintiff Gagne possessed based on his prior Danaher-affiliated experience, including his Beckman Coulter and Cytiva work.

156.   Plaintiff Gagne met all of the requirements of the posted positions for which he applied including education and experience requirements, and his application materials reflected his qualifications for the roles sought at Danaher, Cytiva and Beckman Coulter.

157.   Plaintiff Gagne was highly qualified for the Regional Sales Manager position and was at least as qualified as, if not more qualified than, the candidates advanced or selected for the role.

158.   Plaintiff Gagne was not hired for the Regional Sales Manager position.

159.    Danaher selected a female candidate for the Regional Sales Manager position.

160.    The selected female candidate had materially less relevant experience than Plaintiff Gagne, including no management experience and approximately two years of total company experience.

161.    Plaintiff Gagne was denied interviews for certain positions and denied selection for others pursuant to the same centralized slate constraints described herein. Plaintiff Gagne applied to posted roles, met the stated minimum qualifications, and was denied interview and/or selection while Danaher and its OpCos continued the hiring process.

162.    Danaher and its OpCos' centralized talent acquisition personnel controlled which applicants would be advanced to hiring managers and which applicants would be screened out before any hiring-manager interview pursuant to the DEI Policy.

163.    Danaher and its OpCos' decision to deny Plaintiff Gagne interviews and selection was based on the DEI Policy and related hiring and advancement framework, which favored candidates considered "underrepresented" over white male candidates, including Plaintiff Gagne.

164.    Based on requisition status (including "offer closed," "filled," and/or similar disposition codes), and the continued progression of other candidates, Plaintiff Gagne alleges he was denied interview and/or selection despite meeting posted minimum qualifications.

165.    Danaher and its OpCos advanced other candidates to interviews and filled at least some of the roles for which Plaintiff Gagne applied after screening him out and/or denying him selection, through a process constrained by demographic slate requirements. Those demographic requirements operated as mandatory conditions for moving a requisition forward, such that otherwise qualified non-"underrepresented" applicants could be excluded from interview consideration to preserve or achieve the required slate composition.

166. Based on Danaher's published Diverse Talent Attraction Guide, the Inclusive Hiring Playbook, the No Diverse Slate Offer Exception Form, and Danaher's Form 10-K and Sustainability Report, Plaintiff Gagne was denied positions because he is a white man, and therefore not considered underrepresented pursuant to Danaher's DEI Policy.

167. Plaintiff Gagne's non-selection for the Regional Sales Manager position is a concrete example of the discriminatory policy in action: Danaher rejected a white male applicant with approximately fifteen years of relevant Danaher-affiliated experience and selected a female candidate who had no management experience and only approximately two years of total company experience.

168. Additionally, even though Plaintiff Gagne passed the screening, he was not hired after his interview due to Danaher and OpCos requiring hiring managers to hire a certain amount of POC and female employees. Specifically, the "People & Culture" category was 15-25% of a manager's overall performance review.

169. Plaintiff Gagne suffered adverse employment actions because he was denied the positions because of his race and sex. That is, Danaher and its OpCos factored race and sex into their hiring decision-making.

170. Plaintiff Gagne is ready, willing and able to apply for employment with Danaher or its OpCos in the future and is presently deterred by the challenged policies.

### *Plaintiff Farrell*

171. Plaintiff Farrell is a white man.

172. Plaintiff Farrell's sex and race were known by Danaher and Pall through his application materials (including the voluntary EEO self-identification fields he completed) and

their applicant-tracking, demographic-monitoring, and other hiring systems during the hiring process.

173. Plaintiff Farrell was subjected to unlawful discrimination based upon his race and sex.

174. Plaintiff Farrell applied for positions, including Field Sales Specialist, for which he was qualified at Danaher, and Pall.

175. For each such position, Plaintiff Farrell applied through Danaher's applicant tracking system.

176. The positions Plaintiff Farrell sought including, Field Sales Specialist, required relevant sales, customer-relationship, product, territory, account-management, and/or industry experience.

177. Plaintiff Farrell was an external applicant at the time he applied for the Field Sales Specialist position and the other positions at issue.

178. The Field Sales Specialist position required experience in sales, customer relationships, product knowledge, territory development, account management, and/or industry-specific business development.

179. Plaintiff Farrell met all of the posted requirements for the positions for which he applied at Danaher and Pall. Plaintiff Farrell's application materials demonstrated that he satisfied the stated minimum qualifications for the roles to which he applied.

180. Plaintiff Farrell's qualifications matched the posted requirements because his application materials reflected the relevant sales, customer-facing, account-management, product, territory, and/or industry experience required for the Field Sales Specialist positions.

181. Despite meeting the position requirements, Plaintiff Farrell was denied the opportunity to interview and was not hired for every position for which he applied.

182. Based on requisition status (including "offer closed," "filled," and/or similar disposition codes), and the continued progression of other candidates, Plaintiff Farrell alleges he was screened out at the centralized gatekeeping step and denied interview. Plaintiff Farrell applied to posted roles, met the stated minimum qualifications, and was rejected at the centralized screening stage before any interview with the hiring manager.

183. Danaher and its OpCos' centralized talent acquisition personnel controlled which applicants would be advanced to hiring managers and which applicants would be screened out before any hiring-manager interview pursuant to the DEI Policy.

184. Danaher and Pall advanced other candidates to interviews and filled at least some of the roles for which Plaintiff Farrell applied after screening Plaintiff Farrell out, through a process constrained by demographic slate requirements.

185. The candidates advanced or selected for the positions Plaintiff Farrell sought were candidates whom Defendants classified as "underrepresented" for slate-compliance purposes, including female and/or POC candidates, while Farrell was classified as a white male and therefore not "underrepresented." Defendants' ATS and requisition records will identify the interview slate, demographic slate-compliance status, selected candidate, and disposition reason for each Field Sales Specialist requisition.

186. Based on Danaher's published Diverse Talent Attraction Guide, the Inclusive Hiring Playbook, the No Diverse Slate Offer Exception Form, and Danaher's Form 10-K and Sustainability Report, Plaintiff Farrell was denied positions because he is a white man, and therefore not considered underrepresented pursuant to Danaher's DEI Policy.

36

187. The inference of discrimination is further supported by Plaintiff Farrell's satisfaction of the posted requirements, his rejection before any hiring-manager interview, the continued progression of other candidates, and Danaher and Pall's use of race- and sex-conscious hiring and slate requirements.

188. Plaintiff Farrell suffered adverse employment actions because he was denied the positions because of his race and sex. That is, Danaher and Pall factored race and sex into their hiring decision-making.

189. Plaintiff Farrell is ready, willing and able to apply for employment with Danaher or its OpCos in the future and is presently deterred by the challenged policies.

## DEFINITIONS

190. For purposes of the classes alleged below, an applicant is "not advanced" where Defendants' records reflect that the applicant was screened out, rejected, coded as not advanced, not selected or otherwise removed from consideration during Defendants' centralized Talent Acquisition screening process, DEI-driven recruiting workflow, demographic interview-slate process, or slate-compliance review before any first interview or individualized hiring-manager review.

191. For purposes of the classes below, "qualified applicants" means applicants whose submitted application materials facially reflected the requisition's stated minimum objective qualifications, or whose records do not show rejection for an expressly stated hard-stop requirement, as reflected in Defendants' job postings, requisition records, application materials, candidate-stage data, and screening records.

192. For purposes of the classes, class membership is ascertainable from Defendants' records, including DEI scorecard records, slate-compliance records, demographic reporting fields,

applicant profiles, resumes, job requisition records, application-status histories, rejection notices, candidate-stage designations, interview records, Talent Acquisition notes, and hiring outcomes.

193. For purposes of the classes, "Covered Positions" refers to any position posted by Danaher or any OpCo, and that were subject to Danaher's DEI-driven recruiting process, demographic interview-slate requirements, and slate-compliance reporting, before any first interview or individualized hiring-manager review.

## RULE 23 CLASS ACTION ALLEGATIONS

194. Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (c)(4) seeking liability phase injunctive and declaratory relief.

195. Plaintiffs seek monetary relief, including back pay and punitive damages where available, under Rule 23(b)(3) and Rule 23(c)(4). Plaintiffs bring this action on behalf of themselves and similarly situated applicants who were subjected to Danaher and its OpCos' common DEI Policy, centralized screening process, demographic interview-slate requirements, and related hiring practices.

196. Plaintiffs Nadeau and Farrell bring this Class Action pursuant to Federal Rule of Civil Procedure 23 on behalf of a proposed "Title VII Class" of similarly situated persons (subject to revision as may be necessary), defined as follows:

> **All external applicants, who during the applicable statute of limitations 1) applied through Danaher's applicant-tracking system to a Covered Position with Danaher, Pall, Beckman Coulter, Cytiva, or Sciex, 2) were coded in Defendants' ATS, slate-review, exception-review, or related recruiting records as not female and not "underrepresented," or otherwise as not qualifying toward the underrepresented slate requirement, 3) whose applications were screened by Danaher or its OpCos under the mandatory rule requiring that at least 50% of the interview slate be "underrepresented," before any hiring-manager interview, 4) who met the posted minimum qualifications for the position, as reflected in the application materials, requisition records, and screening records, 5) who were not rejected based on position-specific**

**"knockout" criteria pursuant to recruiting records, and 6) were rejected, dispositioned, or otherwise not advanced before any first interview.**

197. Plaintiffs Nadeau and Farrell bring this action pursuant to Federal Rule of Civil Procedure 23 on behalf of a proposed "42 U.S.C. 1981 Class" of similarly situated persons (subject to revision as may be necessary), defined as follows:

> **All external applicants, who during the applicable statute of limitations 1) applied through Danaher's applicant-tracking system to Covered Position with Danaher, Pall, Beckman Coulter, Cytiva, or Sciex, 2) were   coded   in Defendants' ATS, slate-review, exception-review, or related recruiting records as not a person of color, not racially diverse, or otherwise not qualifying toward the race-based portion of the underrepresented slate requirement 3) whose applications were screened by Danaher or its OpCos under the mandatory rule requiring that at least 50% of the interview slate be "underrepresented," before any hiring-manager interview, 4) met the posted minimum qualifications for the position, as reflected in the application materials, requisition records, and screening records, 5) who were not rejected based on position-specific "knockout" criteria pursuant to recruiting records, and 6) were rejected, dispositioned, or otherwise not advanced before any first interview.**

198. Plaintiff Nadeau brings a subclass pursuant to Federal Rule of Civil Procedure 23 under the Massachusetts Fair Employment Practices Act ("MFEPA") on behalf of a proposed "MFEPA Sciex Class" of similarly situated persons (subject to revision as may be necessary), defined as follows:

> **All external applicants who, during the applicable statute of limitations 1) applied through Danaher's applicant-tracking system to a posted Covered Position with Sciex for employment in Massachusetts, 2) were coded in Defendants' ATS, slate-review, exception-review, or related recruiting records as not female and not "underrepresented," or otherwise as not qualifying toward the underrepresented slate requirement,  3) whose applications were screened by Danaher or Sciex under the mandatory rule requiring that at least 50% of the interview slate be "underrepresented," before any hiring-manager interview, 4) who met the minimum qualifications for the posted position, as reflected in application materials, requisition records, screening records, or other records maintained by Danaher or Sciex, 5) who were not rejected based on position-specific "knockout" criteria pursuant to recruiting records, and 6) were rejected, dispositioned, or otherwise not advanced before any first interview.**

199.    Plaintiff Nadeau brings a subclass pursuant to Federal Rule of Civil Procedure 23 under the Massachusetts Fair Employment Practices Act ("MFEPA")  on behalf of a proposed "MFEPA Cytiva Class" of similarly situated persons (subject to revision as may be necessary), defined as follows:

**All external applicants who, during the applicable statute of limitations:1) applied through Danaher's applicant-tracking system to a posted Covered Position with Cytiva for employment in Massachusetts, 2)were coded in Defendants' ATS, slate-review, exception-review, or related recruiting records as not female and not "underrepresented," or otherwise as not qualifying toward the underrepresented slate requirement; , 3) whose applications were screened by Danaher or Cytiva under the mandatory rule requiring that at least 50% of the interview slate be "underrepresented," before any hiring-manager interview, 4) who met the minimum qualifications for the posted position, as reflected in application materials, requisition records, screening records, or other records maintained by Danaher or Cytiva, 5) who were not rejected based on position-specific "knockout" criteria pursuant to recruiting records, and 6) were rejected, dispositioned, or otherwise not advanced before any first interview.**

200.    Plaintiff Nadeau brings a subclass pursuant to Federal Rule of Civil Procedure 23 under the Massachusetts Fair Employment Practices Act ("MFEPA") on behalf of a proposed "MFEPA Beckman Coulter Class" of similarly situated persons (subject to revision as may be necessary), defined as follows:

**All external applicants who, during the applicable statute of limitations 1) applied through Danaher's applicant-tracking system to a posted Covered Position with Beckman Coulter for employment in Massachusetts,  2) were coded in Defendants' ATS, slate-review, exception-review, or related recruiting records as not female and not "underrepresented," or otherwise as not qualifying toward the underrepresented slate requirement; 3) whose application was screened by Danaher or Beckman Coulter under the mandatory rule requiring that at least 50% of the interview slate be "underrepresented," before any hiring-manager interview,  4) who met the minimum qualifications for the posted position, as reflected in application materials, requisition records, screening records, or other records maintained by Danaher or Beckman Coulter, 5) who were not rejected based on position-specific "knockout" criteria pursuant to recruiting records, and 6) were rejected, dispositioned, or otherwise not advanced before any first interview.**

201. Plaintiff Gagne brings a subclass pursuant to Federal Rule of Civil Procedure 23 under the New Hampshire Law Against Discrimination ("NHLAD") on behalf of a proposed "NHLAD Cytiva Class" of similarly situated persons (subject to revision as may be necessary), defined as follows:

**All external applicants who, during the applicable statute of limitations 1) applied through Danaher's applicant-tracking system to a posted Covered Position with Cytiva for employment in New Hampshire  2) were coded in Defendants' ATS, slate-review, exception-review, or related recruiting records as not female and not "underrepresented," or otherwise as not qualifying toward the underrepresented slate requirement; 3) whose application was screened by Danaher or Cytiva under the mandatory rule requiring that at least 50% of the interview slate be "underrepresented," before any hiring-manager interview, 4) who met the minimum qualifications for the posted position, as reflected in application materials, requisition records, screening records, or other records maintained by Danaher or Cytiva, 5) who were not rejected based on position-specific "knockout" criteria pursuant to recruiting records, 6) were interviewed for the position,  and 7) was not offered the position and the position was filled by a candidate coded female or underrepresented.**

202. Plaintiff Gagne brings a subclass pursuant to Federal Rule of Civil Procedure 23 under the New Hampshire Law Against Discrimination ("NHLAD")  on behalf of a proposed "NHLAD Beckman Coulter Class" of similarly situated persons (subject to revision as may be necessary), defined as follows:

**All external applicants who, during the applicable statute of limitations 1) applied through Danaher's applicant-tracking system to a posted Covered Position with Beckman Coulter for employment in New Hampshire, 2)  were coded in Defendants' ATS, slate-review, exception-review, or related recruiting records as not female and not "underrepresented," or otherwise as not qualifying toward the underrepresented slate requirement 3) whose application was screened by Danaher or Beckman Coulter under the mandatory rule requiring that at least 50% of the interview slate be "underrepresented," before any hiring-manager interview, 4) who met the minimum qualifications for the posted position, as reflected in application materials, requisition records, screening records, or other records maintained by Danaher or Beckman Coulter, 5) who were not rejected based on position-specific "knockout" criteria pursuant to recruiting records, 6) were**

**interviewed for the position, and 7) was not offered the position and the position was filled by a candidate coded female or underrepresented.**

203.    Plaintiff Farrell brings a subclass pursuant to Federal Rule of Civil Procedure 23 under the Texas Commission on Human Relations Act ("TCHRA") on behalf of a proposed "TCHRA Pall Class" of similarly situated persons (subject to revision as may be necessary), defined as follows:

> **All external applicants who, during the applicable statute of limitations 1) applied through Danaher's applicant-tracking system to a posted Covered Position with Pall for employment in Texas,  2) were coded in Defendants' ATS, slate-review, exception-review, or related recruiting records as not female and not "underrepresented," or otherwise as not qualifying toward the underrepresented slate requirement, 3) whose application was screened by Danaher or Pall under the mandatory rule requiring that at least 50% of the interview slate be "underrepresented," before any hiring-manager interview, 4) who met the minimum qualifications for the posted position, as reflected in application materials, requisition records, screening records, or other records maintained by Danaher or Pall, 5) who were not rejected based on position-specific "knockout" criteria pursuant to recruiting records, and 6)were rejected, dispositioned, or otherwise not advanced before any first interview.**

204.    Plaintiffs have standing to seek the relief sought as stated herein, as Class Representatives are members of the Classes they wish to represent and have been harmed by Danaher's unlawful DEI Policy. The Class Representatives seek to secure relief applicable to themselves and the similarly situated Class members; such relief is properly sought in a class action as much of the necessary relief addresses systemic issues of discriminatory hiring policies that have harmed all Class members and all those who will become Class Members.

205.    Further, the proposed Classes and subclasses are ascertainable because membership can be determined from objective criteria and Danaher and its OpCos' own centralized records, including applicant records, applications, requisition files, job descriptions, screening records, interview status, disposition codes, hiring outcomes, and demographic reporting fields.

## PLAINTIFFS SATISFY RULE 23(A)

206.    **Numerosity**. The members of the putative classes are so numerous that joinder is practically impossible. Danaher's DEI Policy was enforced with respect to hundreds, if not thousands, of job postings, for which thousands of putative Class Members submitted applications. Based on the number of putative Class Members and their geographic dispersal, joinder is impracticable. The names and addresses of putative Class Members are identifiable through Danaher's applicant records and putative Class Members may be notified of this action by mailed or electronic notice.

207.    Joinder is further impracticable because many Class Members may not know that Danaher and its OpCos' race- and sex-based slate-composition requirements affected their applications, and the relevant information concerning screening decisions, demographic classifications, and slate compliance is primarily within Defendants' possession.

208.    Plaintiffs estimate that the class size for each class will be between one hundred (100) to one thousand (1,000) class members.

209.    **Commonality**. Class treatment is also appropriate because questions of law or fact common to the putative Classes predominate over any questions affecting only individual members of the putative Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Additionally, these questions of law and fact common to the putative Classes are capable of classwide resolution in one stroke, the determination of which will resolve issues central to the validity of each Class Member's claim. Such common questions include:

> a.   Whether Danaher and its OpCos have engaged in unlawful systemic discrimination on the basis of race and sex/gender, with respect to hiring;

b. Whether Danaher and its OpCos maintained and enforced a centralized DEI Policy and interview-slate requirements applicable across Danaher and its OpCos;

c. Whether Danaher and its OpCos intentionally reserved interview-slate capacity for women and POC applicants disproportionate to the composition of the applicant pool;

d. Whether Danaher and its OpCos intentionally excluded white men from interview slates;

e. Whether the DEI Policy is discriminatory;

f. Whether the DEI Policy established unlawful quotas;

g. Whether Danaher and its OpCos used race, sex, POC status, or "underrepresented" status in screening applicants, constructing interview slates, and advancing or rejecting candidates at the centralized screening stage;

h. Whether Danaher's and its OpCos' applicant-tracking, recruiting, or reporting systems tracked demographic information used for slate compliance;

i. The appropriate measure of relief and damages to affected Class Members.

210. These common questions do not require the Court to determine why every individual applicant was rejected at the certification stage. The central common question is whether Danaher and its OpCos maintained and enforced a centralized policy or practice that used race and sex to determine who could advance past the centralized screening stage to a hiring-manager interview. Plaintiffs seek classwide adjudication of that centralized gatekeeping injury;

44

individualized damages or later hiring-manager selection issues can be resolved, if necessary, only after common liability is determined.

211.   Plaintiffs' class claims are amenable to common proof because the central question is whether Danaher's and its OpCos' standardized, centralized interview-slate rules and screening procedures used race and sex as criteria for advancing candidates to a hiring-manager interview. That question can be resolved based on common evidence, including Danaher's and its OpCos' written policies, training materials, centralized reporting, applicant-tracking system data, recruiter workflows, and uniform compliance mechanisms.

212.   The discriminatory impact and intent of the interview-slate requirements are susceptible to classwide proof through common applicant-flow and requisition-level data maintained by Danaher and its OpCos' centralized recruiting systems, as well as uniform documentation reflecting why candidates were screened out, why requisitions were escalated or reopened, and how slate-composition targets affected interview selection.

213.   Common proof will show whether the slate-composition requirements caused qualified white male applicants to be excluded from interview opportunities relative to their representation in the qualified applicant pool.

214.   Certification of the Named Plaintiffs' claims as a class action is the most efficient and economic means of resolving the questions of law and fact common to Plaintiffs' claims and Class claims. Failure to proceed as a class action would result in an impracticable number of individual suits seeking to resolve the same claims arising from the same centralized screening policy and practice. Proceeding on an individual basis would further pose an unnecessary risk of inconsistent adjudications. Moreover, individual Class Members face a high threat of being

financially unable or unwilling to seek vindication of their statutory rights through individual claims.

215. **Typicality**. Named Plaintiffs raise claims typical of the classes they seek to represent and pursue the same factual and legal theories as the classes they seek to represent and seek similar relief. Named Plaintiffs, like Class Members, are applicants coded in Defendants' ATS, slate-review, exception-review, or related recruiting records as not female and not "underrepresented," or otherwise as not qualifying toward the underrepresented slate requirement, met the minimum qualifications, were processed through Danaher and its OpCos' centralized hiring system, and were screened out before any hiring-manager interview under circumstances supporting the inference that race and sex were used to determine who advanced past the centralized screening stage.

216. Danaher's internal records contain sufficient information to identify Class Members.

217. Danaher and its OpCos have been and continue to be engaged in a pattern and practice of hiring practices that discriminate against white male applicants. Their conduct has harmed and affected Named Plaintiffs and Class Members in substantially the same way, by denying them equal access to interviews, advancement, and hiring opportunities.

218. **Adequacy**. Named Plaintiffs are willing and able to represent the interests of the putative classes they seek to represent and will do so fairly and vigorously. Plaintiffs are prepared to assist in this action and make informed decisions to protect the interests of the putative classes. Plaintiffs' interests are aligned with the interests of the Classes they seek to represent, and Named Plaintiffs, as white men allegedly excluded from interview slates, do not have interests antagonistic to any Class Member.

46

219. Named Plaintiffs' counsel is experienced in employment discrimination matters and class action litigation and will vigorously prosecute this action on behalf of the putative classes. The experience, knowledge, and resources of Plaintiffs' counsel, together with the assistance of the Named Plaintiffs, satisfy Rule 23's adequacy requirements.

## PLAINTIFFS SATISFY RULE 23(b)(2)

220. Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Danaher and its OpCos have acted and/or refused to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to Plaintiffs and the Class as a whole. The Class Members are entitled to injunctive relief to end Danaher's and its OpCos' use of race or sex in screening, interview slate construction and requisition-level gatekeeping.

221. Danaher and its OpCos' challenged conduct was not isolated or individualized. Danaher and its OpCos maintained and enforced a centralized DEI Policy, demographic interview-slate requirements, and Talent Acquisition screening procedures that applied generally to applicants processed through their hiring system.

222. Plaintiffs and Class Members are entitled to injunctive relief requiring Danaher and its OpCos to cease using race or sex in hiring, screening, interview-slate construction, candidate advancement, or selection decisions.

223. Danaher and its OpCos have acted on grounds generally applicable to the putative classes and appropriate injunctive and declaratory relief would apply to and benefit the putative Classes as a whole.

## PLAINTIFFS SATISFY RULE 23(b)(3)

224.   Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the class as to the liability-phase question whether Danaher's and its OpCos' centralized screening policy used race and sex to exclude white men from interview slates, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The Class Members have been damaged and are entitled to recovery as a result of Danaher and its OpCo's common, uniform, unfair and discriminatory centralized screening policy and practice. The propriety and amount of punitive damages are based on Danaher's conduct, making these issues common to the putative Classes.

225.   Common questions predominate because liability turns principally on Defendants' common policies and practices, including whether Defendants used race- and sex-based slate requirements, demographic classifications, centralized screening procedures, and compliance mechanisms to deny qualified applicants interviews, advancement, or hiring opportunities.

226.   Any individualized questions concerning the extent of damages, the specific position sought, or the amount of back pay owed do not defeat predominance because those questions can be addressed in a separate damages phase or through individual proceedings after common liability issues are resolved on a classwide basis.

227.   Damages can be determined through Danaher and its OpCos' records, formulaic calculations, expert analysis, subclasses, claims administration, hearings, or later individualized proceedings if necessary.

228.   Certification of the Named Plaintiffs' claims as a class action is the most efficient and economic means of resolving the questions of law and fact common to Plaintiffs' claims and Class claims. Failure to proceed as a class action would result in an impracticable number of

individual suits seeking to resolve the same claims arising from the same centralized policies and practices.

229.    Danaher has acted on grounds generally applicable to the putative classes and appropriate injunctive and declaratory relief would apply to and benefit the putative Classes as a whole.

## ALLEGATION REGARDING INJUNCTIVE RELIEF

230.    Named Plaintiffs have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and the injunctive relief they seek in this action is the only means of securing complete and adequate relief. Named Plaintiffs, and the Classes they seek to represent, are now suffering, will continue to suffer, irreparable injury from Danaher's discriminatory conduct.

231.    Danaher and its OpCos' actions have caused and continue to cause Plaintiffs and all Class Members substantial losses in earnings and other employment benefits.

232.    In addition, Plaintiffs and Class Members suffer and continue to suffer emotional distress, humiliation, embarrassment, and anguish, all to their damage in an amount according to proof.

233.    Danaher and its OpCos performed the acts herein alleged with malice or reckless indifference. Plaintiffs and Class Members are thus entitled to recover punitive damages in an amount according to proof.

## COUNT I
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000E, ET SEQ.**
**(SEX AND RACE DISCRIMINATION)**

234.    Named Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1-195; 203-232 as though fully set forth herein.

49

235. Danaher's conduct, as alleged herein, violated Title VII, which prohibits discrimination on the basis of sex and race.

236. Danaher discriminated against Named Plaintiffs on the basis of their gender (male), and race (white).

237. Danaher has engaged in an intentional, company-wide and systematic policy, pattern, and/or practice of discrimination against its white male employees. Danaher has intentionally discriminated against Named Plaintiffs and the Class in violation of Title VII by, among other things:

   a. Implementing a DEI Policy that favored certain applicants and candidates because of their gender and race, over other applicants and candidates who were of a different sex, male, or race, white.

   b. Using race as a consideration in hiring decisions;

   c. Using sex as a consideration in hiring decisions;

238. Danaher's unlawful employment practices were intentional and done with malice and reckless indifference to Named Plaintiffs' federally protected rights.

239. As a direct result of Danaher's discriminatory actions, Named Plaintiffs have suffered damages including lost wages, non-monetary damages and attorney's fees.

   **WHEREFORE**, Named Plaintiffs seek relief as follows:

   a. Certification of the putative Title VII Class;

   b. Designation of Named Plaintiffs as representatives of the Class;

   c. Designation of Named Plaintiffs' counsel of record as Class Counsel;

   d. A declaratory judgment that the practices complained of herein are unlawful and violate Title VII;

50

e.  A preliminary and permanent injunction against Danaher and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in policies, patterns and/or practices that discriminate against Named Plaintiff or the Class because of race, sex or participation in this lawsuit;

f.  An order that Defendants institute and carry out policies, practices, and programs that provide equal employment opportunities for all employees regardless of race or sex, and that they eradicate the effects of their past and present unlawful employment practices;

g.  An order requiring Defendants to develop and institute accurate and validated standards for evaluating performance, assigning opportunities, and determining compensation;

h.  An order retaining jurisdiction over this action to ensure that Defendants comply with such a decree;

i.  Monetary damages arising from Danaher's discriminatory conduct;

j.  Exemplary and punitive damages in an amount commensurate with Danaher's ability to pay and to deter future conduct;

k.  Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

l.  Pre-judgment and post-judgment interest, as provided by law; and

m.  Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## COUNT II
## VIOLATION OF 42 U.S.C. § 1981

**(RACE DISCRIMINATION)**

240. Named Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1-192; 193-194; 196; 203-232 as though fully set forth herein.

241. Danaher's conduct, as alleged herein, violated 42 U.S.C. § 1981, which prohibits discrimination on the basis of race.

242. Named Plaintiffs are white and therefore members of a protected class.

243. Danaher denied Named Plaintiffs employment opportunities based on their race in violation of 42 U.S.C. § 1981.

244. Plaintiffs' § 1981 claims are based on intentional race discrimination affecting the making and enforcement of employment contracts, including discrimination in recruiting, screening, interviewing, and hiring decisions. Plaintiffs allege race was a but-for cause in the screening-out and non-selection decisions that affected them, including Defendants' explicit focus on "underrepresented" racial categories and the use of race-based interview-slate targets.

245. Plaintiffs allege facts supporting that Defendants favored candidates because they were members of racial minority groups and disadvantaged Plaintiffs because they were not. Plaintiffs allege based on Defendants' race-based slate requirements and race-focused reporting—that the decision to exclude Plaintiffs from interview or selection was made to achieve or preserve the required racial composition of the interview slate.

246. Similarly situated employees that were not white received preferential treatment when applying for external positions.

247. Danaher has engaged in an intentional, company-wide and systematic policy, pattern, and/or practice of discrimination against its white employees and applicants. Danaher has

52

intentionally discriminated against Plaintiffs and the Class in violation of 42 U.S.C. § 1981 by, among other things:

    a.  Implementing a DEI Policy that favored certain applicants and candidates because of their gender and race, over other applicants and candidates who were white;

    b.  Using race as a consideration in hiring decisions;

248.    As a direct result of Danaher's discriminatory actions, Named Plaintiffs suffered damages including lost wages, non-monetary damages and attorney's fees.

**WHEREFORE**, Named Plaintiffs seek relief as follows:

    a.  Certification of the putative § 1981 Class;

    b.  Designation of Named Plaintiffs as representatives of the Class;

    c.  Designation of Named Plaintiffs' counsel of record as Class Counsel;

    d.  A declaratory judgment that the practices complained of herein are unlawful and violate 42 U.S.C. §§ 1981;

    e.  A preliminary and permanent injunction against Danaher and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in policies, patterns and/or practices that discriminate against Named Plaintiffs or the Class because of race or participation in this lawsuit;

    f.  An order that Defendants institute and carry out policies, practices, and programs that do not factor race into hiring and selection criteria;

    g.  An order requiring Defendants to develop and institute accurate and validated standards for evaluating performance, assigning opportunities, and determining compensation;

h.  An order retaining jurisdiction over this action to ensure that Defendant complies with such a decree;

i.  Monetary damages arising from Danaher's discriminatory conduct;

j.  Exemplary and punitive damages in an amount commensurate with Danaher's ability to pay and to deter future conduct;

k.  Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

l.  Pre-judgment and post-judgment interest, as provided by law; and

m.  Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## COUNT III

### VIOLATION OF MASSACHUSETTS FAIR EMPLOYMENT PRACTICES ACT, M.G.L. C. 151B (SEX AND RACE DISCRIMINATION)

249.  Plaintiff Nadeau repeats and realleges the allegations set forth in Paragraphs 1-146; 189-194; 197-199; 203-232 as though fully set forth herein.

250.  Cytiva, Beckman Coulter and Sciex's conduct, as alleged herein, violated MFEPA, which prohibits discrimination on the basis of sex and race.

251.  Cytiva, Beckman Coulter and Sciex discriminated against Plaintiff Nadeau on the basis of his gender (male), and race (white).

252.  Cytiva, Beckman Coulter and Sciex have engaged in an intentional, company-wide and systematic policy, pattern, and/or practice of discrimination against its white male employees. Cytiva, Beckman Coulter and Sciex have intentionally discriminated against Plaintiff Nadeau and the Class in violation of MFEPA by, among other things:

54

   a. Implementing a DEI Policy that favored certain applicants and candidates because of their gender and race, over other applicants and candidates who were of a different sex, male, or race, white.

   b. Using race as a consideration in hiring decisions;

   c. Using sex as a consideration in hiring decisions;

253. Cytiva, Beckman Coulter and Sciex's unlawful employment practices were intentional and done with malice and reckless indifference to Plaintiff Nadeau's state protected rights.

254. As a direct result of Cytiva, Beckman Coulter and Sciex's discriminatory actions, Plaintiff Nadeau has suffered damages including lost wages, non-monetary damages and attorney's fees.

   **WHEREFORE**, Plaintiff Nadeau seeks relief as follows:

   a. Certification of the putative MFEPA Classes;

   b. Designation of Plaintiff Nadeau as representatives of the Classes;

   c. Designation of Plaintiff Nadeau's counsel of record as Class Counsel;

   d. A declaratory judgment that the practices complained of herein are unlawful and violate MFEPA;

   e. A preliminary and permanent injunction against Cytiva, Beckman Coulter and Sciex and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from using race or sex in hiring decisions;

   f. An order retaining jurisdiction over this action to ensure that Cytiva, Beckman Coulter and Sciex complies with such a decree;

g. Monetary damages arising from Cytiva, Beckman Coulter and Sciex's discriminatory conduct;

h. Exemplary and punitive damages in an amount commensurate with Cytiva, Beckman Coulter and Sciex's ability to pay and to deter future conduct;

i. Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

j. Pre-judgment and post-judgment interest, as provided by law; and

k. Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

**COUNT IV**

**VIOLATION OF NEW HAMPSHIRE LAW AGAINST DISCRIMINATION, RSA 354-A:7**
**(SEX AND RACE DISCRIMINATION)**

255. Plaintiff Gagne repeats and realleges the allegations set forth in Paragraphs 1-118; 147-169; 189-194; 200-201; 203-232 as though fully set forth herein.

256. Cytiva and Beckman Coulter's conduct, as alleged herein, violated NHLAD, which prohibits discrimination on the basis of sex and race.

257. Cytiva and Beckman Coulter discriminated against Plaintiff Gagne on the basis of his gender, male, and race, white.

258. Cytiva and Beckman Coulter have engaged in an intentional, company-wide and systematic policy, pattern, and/or practice of discrimination against its white male employees. Cytiva and Beckman Coulter have intentionally discriminated against Plaintiff Gagne and the Class in violation of NHLAD by, among other things:

56

a. Implementing a DEI Policy that favored certain applicants and candidates because of their gender and race, over other applicants and candidates who were of a different sex, male, or race, white.

b. Using race as a consideration in hiring decisions;

c. Using sex as a consideration in hiring decisions;

259. Cytiva and Beckman Coulter's unlawful employment practices were intentional and done with malice and reckless indifference to Plaintiff Gagne's state protected rights.

260. As a direct result of Cytiva and Beckman Coulter's discriminatory actions, Plaintiff Gagne has suffered damages including lost wages, non-monetary damages and attorney's fees.

**WHEREFORE**, Plaintiff Gagne seeks relief as follows:

a. Certification of the putative NHLAD Classes;

b. Designation of Plaintiff Gagne as representatives of the Classes;

c. Designation of Plaintiff Gagne's counsel of record as Class Counsel;

d. A declaratory judgment that the practices complained of herein are unlawful and violate NHLAD;

e. A preliminary and permanent injunction against Cytiva and Beckman Coulter and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from using race or sex in hiring decisions;

f. An order retaining jurisdiction over this action to ensure that Cytiva and Beckman Coulter comply with such a decree;

g. Monetary damages arising from Cytiva and Beckman Coulter's discriminatory conduct;

57

h. Exemplary and punitive damages in an amount commensurate with Cytiva and Beckman Coulter's ability to pay and to deter future conduct;

i. Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

j. Pre-judgment and post-judgment interest, as provided by law; and

k. Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## Count V

**VIOLATION OF TEXAS COMMISSION ON HUMAN RIGHTS ACT, TEXAS LABOR CODE § 21.051**
**(SEX AND RACE DISCRIMINATION)**

261. Plaintiff Farrell repeats and realleges the allegations set forth in Paragraphs 1-118; 170-194; 202-232 as though fully set forth herein.

262. Pall's conduct, as alleged herein, violated TCHRA, which prohibits discrimination on the basis of sex and race.

263. Pall discriminated against Plaintiff Farrell on the basis of his gender, male, and race, white.

264. Pall has engaged in an intentional, company-wide and systematic policy, pattern, and/or practice of discrimination against its white male employees. Pall has intentionally discriminated against Plaintiff Farrell and the Class in violation of TCHRA by, among other things:

a. Implementing a DEI Policy that favored certain applicants and candidates because of their gender and race, over other applicants and candidates who were of a different sex, male, or race, white.

b. Using race as a consideration in hiring decisions;

58

c.  Using sex as a consideration in hiring decisions;

265.  Pall's unlawful employment practices were intentional and done with malice and reckless indifference to Plaintiff Farrell's state protected rights.

266.  As a direct result of Pall's discriminatory actions, Plaintiff Farrell has suffered damages including lost wages, non-monetary damages and attorney's fees.

**WHEREFORE**, Plaintiff Farrell seeks relief as follows:

a.  Certification of the putative TCHRA Classes;

b.  Designation of Plaintiff Farrell as representative of the Classes;

c.  Designation of Plaintiff Farrell's counsel of record as Class Counsel;

d.  A declaratory judgment that the practices complained of herein are unlawful and violate TCHRA;

e.  A preliminary and permanent injunction against Pall and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from using race or sex in hiring decisions;

f.  An order retaining jurisdiction over this action to ensure that Pall complies with such a decree;

g.  Monetary damages arising from Pall's discriminatory conduct;

h.  Exemplary and punitive damages in an amount commensurate with Pall's ability to pay and to deter future conduct;

i.  Costs incurred herein, including reasonable attorneys' fees to the extent allowable by law;

j.  Pre-judgment and post-judgment interest, as provided by law; and

k.  Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiffs and putative Class Members hereby demand a trial by jury on all issues of fact and damages stated herein.

Dated: June 12, 2026.

Respectfully submitted by,
*/s/ George G. Triantis*
GEORGE G. TRIANTIS, ESQ.
D.C. Bar No.: 1671995
MORGAN & MORGAN, P.A.
201 N. Franklin Street, Suite 700
Tampa, FL 33602
Telephone: 813-577-4761
Facsimile: 813-559-4870
Gtriantis@forthepeople.com

Marc R. Edelman, Esq.
(*Admitted Pro Hac Vice*)
Florida Bar No.: 0096342
MORGAN & MORGAN, P.A.
201 N. Franklin Street, Suite 700
Tampa, Florida 33602
Telephone: 813-577-4722
Facsimile: 813-257-0572
medelman@forthepeople.com

Sophia L. Walker
(*Admitted Pro Hac Vice*)
Florida Bar No.: 1068754
MORGAN & MORGAN, P.A.
201 N. Franklin Street, Suite 700
Tampa, Florida 33602
Telephone: 813-424-5603
Facsimile: 813-329-6944
sophia.walker@forthepeople.com
*Attorneys for Plaintiffs*